**Bobby Dale GRICE, Plaintiff,**

v.

**A/S J. LUDWIG MOWINCKELS and Gearbulk, Ltd., Defendants.**

**Civ. A. No. 79–0276–T.**

United States District Court, S. D. Alabama, S. D.

July 30, 1979.

Harvey J. Lewis, Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, La., John C. Crowder, Jr., Cummingham, Bounds, Byrd, Yance & Crowder, Mobile, Ala., for plaintiff.

George F. Wood, Pillans, Reams, Tappan, Wood, Roberts & Vollmer, P.C., Mobile, Ala., for defendants.

## ORDER

DANIEL HOLCOMBE THOMAS, District Judge.

Upon the basis of the Recommendation of the Magistrate, which is adopted as the opinion of this Court, it is ORDERED, ADJUDGED and DECREED that:

(1) The Motion to Dismiss be and is hereby DENIED;

(2) The Motion to Strike, treated as a motion to dismiss, be and is hereby GRANTED insofar as Plaintiff seeks recovery, pursuant to United States Admiralty substantive law, for breach of the warranty of seaworthiness.

## RECOMMENDATION OF MAGISTRATE CONCERNING MOTION TO STRIKE AND TO DISMISS

DAVID ASHLEY BAGWELL, United States Magistrate.

Defendants A/S J. Ludwig Mowinckels and Gearbulk, Ltd. on July 6, 1979 filed a motion to dismiss, and also a motion to strike claims of unseaworthiness from the complaint. The Court assigned the motions to the Magistrate for hearing and recommendation pursuant to 28 U.S.C. § 636 and, on July 27, 1979, oral argument was had in the Courtroom of the Magistrate. The motion is submitted upon the basis of the pleadings and briefs on file, and oral argument. The motion presents a novel question involving the extraterritorial application of the exclusivity provision of the Longshoremen's and Harbor Workers' Compensation Act ["The Longshoremen's Act"], § 905(b). Because the statute and the legislative history are squarely contrary on this point, a decision for either side is to some degree troubling. The dilemma has been solved by the Supreme Court, as will be seen herein.

The Magistrate recommends that the motion to dismiss be denied and that the motion to strike be granted insofar as the unseaworthiness claim is based upon the General Maritime Law of the United States. The reasoning is not simple.

A. *Background.* Bobby Dale Grice, a resident of Fairhope, Alabama, was on April 18, 1978 working as a longshoreman in Dammam, Saudi Arabia, helping with or supervising the unloading of a cargo of

large concrete housing modules which had been shipped from Mobile, Alabama aboard the M/V GRENA, allegedly owned, operated or chartered by Defendants. The cable on a ship's crane slipped, crushing Grice's arm between a concrete module being lowered, and a flat bed trailer on which it was to have rested.

Because he was hurt in Saudi Arabia, Grice was not eligible for compensation under the Longshoremen's Act, so he brought suit in this Court alleging negligence of the vessel's personnel and—what concerns us here—the unseaworthiness of the M/V GRENA herself. The complaint is in substance a chronological throwback in admiralty, being of the type routinely filed by longshoremen prior to the impact of the 1972 Amendments to the Longshoremen's Act.[1]

■ B. *Motion to Dismiss.* Before reaching the motion to strike, we consider the motion to dismiss. The theory of Defendants is that "[p]laintiff has failed to allege what law is applicable and its nature and hence the complaint fails to state a claim upon which relief can be granted."[2]

Rule 44.1 of the Federal Rules of Civil Procedure provides in part that a "party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice." That is of course simply to avoid surprise; it falls considerably short of a requirement that, in order to survive a Rule 12(b)(6) motion, a plaintiff must allege the identity and substance of the applicable law. Even though Rule 44.1 states by its terms that the ruling on the foreign law is upon a question of law instead of fact, experience teaches that determining the law of many foreign countries—and Saudi

Arabia is probably a paradigmatic example—is considerably more complex than going to the firm's law library. The search may lead to university libraries, embassies, metropolitan practitioners, and often to members of the bar of the foreign nation itself. It would be patently unfair to hold an admiralty lawyer to a requirement that—on pain of dismissal—he set out in the complaint both the choice of law and the applicable substantive law. In a practice in which lawyers are often hired one day before the statute of limitations runs, such a requirement would be exceptionally unfair. Certainly Rule 44.1 does not by its terms impose such a requirement; it would be unreasonable for the Court to do so on its own. The Magistrate recommends that the motion to dismiss be denied. Naturally if foreign law applies and provides no recovery, and Defendants wish to so contend, they may later renew their motion or, far better still, move for summary judgment on that basis.

■ C. *Motion to Strike Unseaworthiness Claim.* The questions raised by the motion to strike the unseaworthiness claim are substantial. Defendants claim that the allegation of unseaworthiness ought to be struck[3] because the 1972 Amendments to the Longshoremen's Act overruled the *Sieracki*[4] doctrine whenever and wherever it might have had any application, so that, for example, Plaintiff here cannot sue under *Sieracki* even though, because he was injured in Saudi Arabia, he is not entitled to compensation under the Longshoremen's Act.[5] Plaintiff, on the other hand, contends that since the Longshoremen's Act is by its own terms limited to the navigable waters of the United States, the exclusivity provision thereof—extending only to "a person

---

1. Pub. Law 92–576, 86 Stat. 1251, "Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972" ("1972 Amendments").

2. Motion to Dismiss, filed July 6, 1979.

3. Actually, it would be dismissal under Rule 12(b)(6) instead of a striking under Rule 12(f), since 12(f) by its terms does not embrace action such as is sought here.

4. *Seas Shipping Co. v. Sieracki,* 328 U.S. 25, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

5. While the pleadings do not show this to be the case, and we do not rely upon it, Plaintiff has obtained limited compensation under the Alabama Workmen's Compensation Act, which is far more stringent in its benefits than is the Longshoremen's Act.

covered under this chapter"—is not extraterritorial in its force and, therefore, there is in some foreign field (here Saudi Arabia) a little bit of pre-1972 American Admiralty jurisprudence (namely, *Sieracki*) frozen in time forever, unaffected by the 1972 Amendments to the Longshoremen's Act. The question is a fascinating one.

1. *Foreign Unseaworthiness Doctrines.* It is not impossible as a matter of law that foreign jurisprudence—presumably Saudi— provides what amounts to a *Sieracki*-like remedy by longshoremen for unseaworthiness. Certainly that is theoretically something which Plaintiff could later prove and, under established Rule 12(b)(6) law, we do not here foreclose the possibility of such proof, even though it may be subject to doubt. In the following discussion we deal only with the *Sieracki* remedy under U.S. law, the only question raised here.

2. *Admiralty Jurisdiction.* Defendants have not asserted lack of Admiralty jurisdiction; we here assume *arguendo* that Admiralty jurisdiction exists. Defendants may later intend to do so and nothing said herein should be deemed to be a suggestion that there is—or is not—Admiralty jurisdiction in this case. Such a determination need not be made *sua sponte* at this point, because the claim is also properly premised upon the alienage jurisdiction in 28 U.S.C. § 1332. Because of our resolution of the unseaworthiness question, the question of Admiralty jurisdiction *vel non* need not be decided now.

3. *1972 Amendments.* The 1972 Amendments to the Longshoremen's Act were a complex bargain struck between stevedores and longshoremen. There were *several* purposes in the action taken by Congress; there was something for both sides.

(a) *Overruling Sieracki/Ryan.*[6] Unquestionably, Congress intended to overrule—at *least* in the United States itself—the whole judicially-built *Sieracki/Ryan* complex which had so effectively nullified the Congressional intent as set out in the exclusivi-

ty portions of the Longshoremen's Act. The Supreme Court recently wrote that this was clearly *one* purpose of Congress:

> Congress acted in 1972, among other things, to eliminate the shipowner's liability to the longshoreman for unseaworthiness and the stevedore's liability to the shipowner for unworkmanlike service resulting in injury to the longshoreman—in other words, to overrule *Sieracki* and *Ryan.*

*Edmonds v. Compagnie Generale Transatlantique,* —— U.S. ——, ——, 99 S.Ct. 2753, 2757, 61 L.Ed.2d 521 (1979).

Had Congress simply enacted a statute saying that *Sieracki* "is overruled", our task here would be quite simple. They did not, of course. There can be little question that Congress *thought* it was doing precisely that, but there is no hint in the legislative history that it occurred to anyone in Congress that *Sieracki* might, unlike the Longshoreman's Act, have extraterritorial effect, or otherwise retain some life in various geographic or occupational pockets no one thought about in 1972.

It is quite clear that Bobby Dale Grice is in a pocket of *Sieracki* seamen which the *literal language* of the statute preserves in its pristine pre-1972 state.

We start with the axiom (here an assumption made for pleading purposes) that Bobby Dale Grice, as a *Sieracki* seaman, would—absent any statutory prohibition— have an action under the General Maritime Law for both negligence and unseaworthiness, an action which in fact he has brought in this case.

The second step is to determine whether the statute abolishes that action. Section 905(b), the exclusivity provision, *ordinary* bars any unseaworthiness action by a longshoreman; that, in fact, was what the 1972 Amendments were intended to do.

Section 905(b), however, does *not* by its terms prevent Grice from bringing an action for breach of the warranty of seawor-

---

6. *Ryan Stevedoring Co. v. Pan-Atlantic S.S.Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

thiness. That provision *begins* by limiting its import to the "event of injury to a person covered by this chapter . . . ." 33 U.S.C. § 905(b). Grice is not *"covered"*, because he was hurt in Saudi Arabia. It is as simple as that; by its terms the Longshoremen's Act does not abrogate Grice's action under the General Maritime Law.

Plaintiff also claims that a second, more equitable consideration suggests that Grice should have his unseaworthiness claim: he did not get the benefit of the 1972 bargain and should not therefore bear its burden. We discuss that next.

(b) *Quid Pro Quo/Failure of Consideration.* The "intent of Congress" does not always pull in a single direction; most statutes are the result of compromise. The 1972 Longshoremen's Act Amendments reflect the archetypal compromise: in return for the abolition of *Sieracki/Ryan* in whole or in part (depending upon the outcome of this case), the longshoring interests obtained from the stevedores higher compensation benefits expanded geographic coverage, and new methods of adjudication. *Edmonds v. Compagnie Generale Transatlantique, —— U.S. ——, —— n.11, 99 S.Ct. 2753, 2757 n.11 (1979).*

Plaintiff in this case points out that there was indeed a *quid pro quo*, and that the longshoreman gave up his seaworthiness remedy (to the extent that the Act takes it away, the issue here) *only* in return for the higher benefits and expanded coverage. Here, Plaintiff says that he did not receive the *benefit* of the Act (since he got *no* benefits) and should not therefore have to bear its *burden* (by being precluded from suing on the basis of unseaworthiness). The argument carries a certain amount of equitable force, and there are several statements in the Congressional history which lend force to the notion that the Act's burdens run only to those who have its bene-

fits. In addition, the statute says so, a more important factor.

For example, *at least* four such comments are in the legislative history:

(i) The Committee also rejected the thesis that a vessel should be liable without regard to its fault for injuries sustained by employees *covered under this Act* . . . .[7]

(ii) The Committee believes that especially with the vast improvement in compensation benefits which the bill would provide, there is no compelling reason to continue to require vessels to assume what amounts to absolute liability for injuries *covered under the Act* . . . .[8]

(iii) *Persons to whom compensation is payable under the Act* retain the right to recoup damages for negligence against the vessel, but under these amendments *they* cannot bring a damage action under the judicially-created doctrine of unseaworthiness.[9]

(iv) It has been the feeling of most employers that while they were willing to guarantee payment to an injured worker regardless of fault, *they would only do so if the right to such payment was the exclusive remedy and they would not be subject to additional law suits because of that injury.*[10]

None of those quotations is perfectly clear, but they do lend support to Plaintiff's theory that the benefit and the burden of the Longshoremen's Act run together, and neither a longshoreman nor a stevedore should have the one unless he also has the other. Indeed, as has been discussed, the language of Section 905(b) itself adopts this *quid pro quo* concept, providing that "a person covered under this chapter" (*i. e.,* someone entitled to compensation) cannot bring an unseaworthiness action. The negative preg-

**7.** House Report, 1972[3] U.S.Code Cong. & Admin.News, p. 4702 [92d Cong.] (emphasis added).

**8.** *Id.* at 4703 (emphasis added).

**9.** *Id.* (emphasis added).

**10.** Report of Senate Committee on Labor and Public Welfare, *quoted in Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 260–61 n.18, 97 S.Ct. 2348, 2356, 53 L.Ed.2d 320 (1977) (emphasis added).

nant of that is that anyone who does *not* get the benefit does not bear the burden. That is precisely what, in the previous section, we have held to be the clear import of the *words* of the statute.

While the statute says that, the equitable argument—outside the wording of the statute—is entitled to reduced weight, for two reasons. First, while failure of consideration is a reputable doctrine in the law of contracts, insofar as we are aware it is entitled to little weight in statutory construction. Second, Bobby Dale Grice is not the only one involved; even if he is held to lose on both the burden and benefit fields, his loss is balanced in the system by someone landward of the admiralty jurisdictional line in the United States, who gave up no unseaworthiness remedy but got a compensation remedy. The equitable balance there was struck by Congress,[11] not this Court.

(c) *Conclusion on Basis of Statute.* Keeping as we must the statute itself as our polestar, it must be the case that the *statute itself* does not preclude the seaworthiness claim.

(d) *Post-1972 Supreme Court Recognition of Legislative Overrule of Sieracki/Ryan.* We have just concluded that a reading of the statute—without more—indicates that nothing in it keeps Bobby Dale Grice from suing for unseaworthiness. Strangely enough, the language of the statute does not alone answer the question in this case.

Anyone who reads the extant legislative history of the 1972 Amendments would be struck by the fact that Congress evidently *intended* to overrule the *Sieracki/Ryan* system *in toto.* The foremost Admiralty scholars have read the legislative history that way, finding prophetically that:

> The evident intention of the . . . draftsman was to consign the thousands of *Sieracki-Ryan* harbor worker cases to the scrap heap. Abolishing the past is not as simple an operation as the abolishers sometimes like to believe. It is much

too early to tell whether the *Sieracki-Ryan* construct, though abolished, will continue to rule us from the grave.

G. Gilmore and C. Black, Handbook on the Law of Admiralty 437–38 (2d ed. 1975). More to the point, they note that:

> Presumably, the draftsman meant to abolish the entire class of *Sieracki*-seamen; if the section is so construed, no one could sue as a *Sieracki*-seaman whether or not he was technically "covered".

*Id.* at 449. Defendants here ask for such a "construction". "Construction" is a mild term for what Gilmore and Black suggest. It calls, instead, for the Court to ignore the plain language of the statute in favor of the equally plain—and unfortunately quite contrary—legislative history.

Certainly the opposition to the 1972 Amendments knew—and stated on the floor—that Congress was abolishing the entire jerry-built *Sieracki/Ryan* structure. Representative Eckhardt stated in the truncated floor debate that:

> Now, if this bill is passed, you wipe out these decisions of a quarter of a century. You wipe out the non-delegable duty of the ship to protect the worker . . . thereby, of course, limiting the remedy of the injured person to that afforded under the Longshoremen's and Harbor Workers' Act . . . .[12]

The Supreme Court of the United States has also been quite forthright about the intent of Congress in 1972 in passing the Longshoremen's Act amendments, which was, "in other words, to overrule *Sieracki* and *Ryan*". *Edmonds v. Compagnie Generale Transatlantique,* —— U.S. ——, ——, 99 S.Ct. 2753 (1979).

A District Court considering the claim of Bobby Dale Grice is therefore not in an enviable position. On the one hand, both Congress, the Supreme Court and the scholars know what Congress *intended* to do in

---

**11.** "[T]he longshoremen are trading their advantage under the seaworthiness clause [sic] for the advantage in increased compensation of others who are not giving up anything." Re-

marks of Rep. Eckhardt, Cong. Record, Oct. 14, 1972 [H. 10042].

**12.** *Id.*

1972; namely, to abolish the entire class of *Sieracki*-seamen. The trouble is that the language Congress used simply did not do the job, at least in the case of Bobby Dale Grice, who was by pure chance injured in a Saudi Arabian preserve of pre-1972 *Sieracki* law. If the District Court follows the wording of the statute, it must disregard the intent of Congress as recognized by Congress, the Supreme Court, and scholars. On the other hand, if it follows the intent of Congress, it must disregard the wording of the statute. The District Court, of course, cannot hack its way out of the jungle by overruling *Sieracki*; only the Congress or the Supreme Court can do that.

The solution though, is to recognize that to the extent the Congress inadvertently left pockets of *Sieracki*-seamen after 1972, they have been eliminated by the Supreme Court's recognition (or "construction") in *Edmonds* a month ago that Congress in 1972 overruled *Sieracki* root and branch. Since that legislative overruling is recognized by the Supreme Court, the lower Courts need no longer follow *Sieracki* in any circumstance. Bobby Dale Grice is therefore not a *Sieracki* seaman.

The sad fact is that Bobby Dale Grice is one of the losers in the 1972 compromise. He lost his *Sieracki* right of action, and he got no compensation in return. It is (to say the least) no consolation to him to hear that someone landward of the *Jensen*[13] line in the United States got the benefit of the act (by getting compensation) without bearing the burden by giving up an unseaworthiness remedy he never had. In every compromise there is some inevitable loss. The balance between stevedore and longshoremen was struck in 1972 by Congress, not by this Court. Our only job is to determine what Congress meant to do. As best we can tell, it meant that people in the situation of Grice had no unseaworthiness remedy.

This construction does not make the "person covered" language of § 905(b) meaningless. Evidently, what Congress meant by that was that Jones Act or other *genuine* (not *Sieracki* or other shake-and-bake) seamen have their unseaworthiness remedy, but all others who might otherwise be entitled to do so cannot sue for breach of the warranty of seaworthiness.

Lest there be any remaining confusion on this point, it should be expressly stated that the *Magistrate* is not overruling *Sieracki*; that would be immoderately presumptuous. Congress did that, and the Supreme Court in *Edmonds* one month ago recognized the legislative overruling.

Accordingly, the Magistrate recommends that:

(1) the motion to Dismiss be denied;

(2) the motion to strike be granted insofar as Plaintiff seeks recovery, pursuant to *United States* Admiralty substantive law, for breach of the warranty of seaworthiness.

DONE this 30th day of July, 1979.

13.  *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).