**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VINCENT SICRE DE FONTBRUNE; LOAN SICRE DE FONTBRUNE; ADEL SICRE DE FONTBRUNE; ANAIS SICRE DE FONTBRUNE, in their capacity as the personal representatives of the Estate of Yves Sicre de Fontbrune, *Plaintiffs-Appellants*, | No. 14-15790 |
| | D.C. No. 3:13-cv-05957-SC |
| v. | |
| ALAN WOFSY; ALAN WOFSY & ASSOCIATES, *Defendants-Appellees.* | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, Senior District Judge, Presiding

Argued and Submitted May 9, 2016
San Francisco, California

Filed September 26, 2016
Amended November 14, 2016

Before: M. Margaret McKeown and Michelle T. Friedland,
Circuit Judges and Richard F. Boulware,[*] District Judge.

Order;
Opinion by Judge McKeown

## SUMMARY[**]

### Foreign Law

The panel reversed the district court's Fed. R. Civ. P. 12(b)(6) dismissal of Yves Sicre de Fontbrune's action seeking to protect his copyright in photographs of Pablo Picasso's artworks, and to enforce a French judgment of two million euros in *astreinte* in federal court against American art editor Alan Wofsy under the California Uniform Foreign-Court Monetary Judgment Recognition Act; and remanded.

California's Uniform Recognition Act governs the enforcement of foreign-country judgments that (1) grant or deny monetary recovery and (2) are "final, conclusive, and enforceable" under the law of the jurisdiction where rendered. Cal. Civ. Proc. Code § 1715(a).

The panel held that Fed. R. Civ. P. 44.1 authorizes district courts to consider foreign legal materials – including expert

---

[*] The Honorable Richard F. Boulware, District Judge for the U.S. District Court for the District of Nevada, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

testimony and declarations – outside the pleadings in rulings on a motion to dismiss because Rule 44.1 treats foreign law determinations as questions of law, not fact. The panel concluded that the district court did not err in considering expert declarations on the content of French law in ruling on Wofsy's Rule 12(b)(6) motion.

The panel held that the district court erred in concluding that the award of an *astreinte* in this case constituted a "fine or other penalty" for the purposes of California's Uniform Recognition Act. The panel further held that the *astreinte* was awarded in the context of a civil action in order to enforce a civil remedy provided for in the French Intellectual Property Code, and no criminal or penal proceedings were involved. The panel concluded that the *astreinte* awarded by the French court to de Fontbrune fell within the Uniform Recognition Act as a judgment that granted a sum of money.

## COUNSEL

Richard Mooney (argued) Rimon PC, San Francisco, California, for Plaintiffs-Appellants.

Neil A.F. Popovic (argued) and Shanna M. Pearce, Sheppard Mullin Richter & Hampton LLP, San Francisco, California, for Defendants-Appellees.

## ORDER

The opinion filed on September 26, 2016, and appearing at 2016 WL 5349749, is hereby amended. An amended opinion is filed concurrently with this order.

With this amendment, the panel has voted to deny the petition for panel rehearing. Judges McKeown and Friedland have voted to deny the petition for rehearing en banc. Judge Boulware recommends denial of the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**. No further petitions for en banc or panel rehearing shall be permitted.

---

**OPINION**

McKEOWN, Circuit Judge:

Justice Holmes once observed that foreign legal systems can appear to the uninitiated "like a wall of stone," impenetrable and unyielding. *Diaz v. Gonzales*, 261 U.S. 102, 106 (1923) (Holmes, J.). For over a century, the federal courts attempted to scale this stone wall by treating questions of foreign law as questions of fact to be pleaded and proved. But over the years, this method proved unsatisfactory, obscuring rather than illuminating the content and nuance of foreign laws. Finally, in 1966, following a proliferation of international litigation, Federal Rule of Civil Procedure 44.1 was adopted to furnish federal courts with a uniform procedure for raising and determining an issue concerning foreign law. Fed. R. Civ. P. 44.1 advisory committee's note. Now, according to the Rule, a "court's determination [of

foreign law] must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

Despite the clear mandate of the federal rule, this appeal illustrates the difficulty that can arise in determining foreign law and the confusion surrounding the role of foreign law in domestic proceedings. The dispute stems from the transcontinental attempts of Yves Sicre de Fontbrune to protect his copyright in photographs of Pablo Picasso's artworks after an American art editor, Alan Wofsy and Alan Wofsy and Associates (collectively, "Wofsy"), reproduced the photographic images. As part of his efforts, de Fontbrune received a judgment in French court of two million euros in "*astreinte*" against Wofsy for copyright violations. De Fontbrune sought to enforce this *astreinte* in federal court in California under the California Uniform Foreign-Court Monetary Judgment Recognition Act ("Uniform Recognition Act" or "the Act"), Cal. Civ. Proc. Code §§ 1713 *et seq.*

The Picasso photographs—intended to convey the quintessence of Picasso's artworks—now require us to delve into the essence of *astreinte*, a French judicial device. The enforceability of the French award turns on whether, in this case, the *astreinte* functions as a fine or penalty—which the Uniform Recognition Act does not recognize—or as a grant of monetary recovery—which is statutorily cognizable. The answer to this question is not a simple matter of translation, but, as we explain, requires a broader look at French law to understand the nature of the *astreinte* remedy in this case, in conjunction with an analysis of California law regarding the enforcement of foreign judgments.

In granting Wofsy's Rule 12(b)(6) motion to dismiss de Fontbrune's claim, the district court considered the parties'

expert declarations on the nature of *astreinte*. We disagree with de Fontbrune's proposition that consideration of such materials outside the pleadings was error. Rather, under Rule 44.1's broad mandate, foreign legal materials—including expert declarations on foreign law—can be considered in ruling on a motion to dismiss where foreign law provides the basis for the claim. We reverse and remand, however, because, the district court erred in concluding that the *astreinte* awarded by the French court in this case functioned as a "fine or other penalty" for purposes of the Uniform Recognition Act.

## BACKGROUND

Between 1932 and 1970, Christian Zervos created a "catalogue raisonné"[1] featuring photographs of Picasso's artistic corpus. The "Zervos Catalog," which contained almost 16,000 photographs of Picasso's art, was ultimately published by Cahiers d'Art and has become a universally recognized reference work. De Fontbrune purchased Cahiers d'Art's publisher's stock in 1979, thereby acquiring intellectual property rights in the Zervos Catalog under French law.

Almost two decades later, Wofsy reproduced several photographs from the Zervos Catalog in two volumes on Picasso, which he offered for sale at a Parisian book fair. De Fontbrune brought suit in French court claiming that these reproductions violated his copyright in the Zervos Catalog.

---

[1] A catalogue raisonné is "[t]he complete published catalogue of an artist's work. Such catalogues . . . are normally regarded as standard publications on the subject." The Concise Oxford Dictionary of Art Terms Online (Michael Clarke & Deborah Clarke eds., 2d ed. 2010).

After a French trial court rejected his claims, de Fontbrune appealed to the Paris Court of Appeal. In a 2001 decision (the "2001 Judgment"), the Court of Appeal concluded that Wofsy was "guilty of infringement of copyright and ha[d] infringed on [de Fontbrune's] rights." The court accordingly prohibited Wofsy "from the use in any manner whatsoever of the [Zervos] photographs under penalty of . . . [*astreinte*] of 10,000 francs by proven infraction," and required Wofsy "to pay Mr. de Fontbrune 800,000 francs in pecuniary damages in redress of his injury resulting from the infringement of copyright."[2]

Ten years later, de Fontbrune filed a claim with an enforcement judge at the Tribunal de Grande Instance de Paris (High Court of Paris) for "[*liquidation d'astreinte*] made against [Wofsy] by judgment of the Paris Court of Appeal[]." De Fontbrune sought "a judgment ordering [Wofsy] to pay him the sum of 2,000,000 euros from the amount of the [*liquidation d'astreinte*]."

In a 2012 decision (the "2012 Judgment"), the enforcement judge found that Wofsy had violated the 2001 Judgment by reproducing copyrighted images from the Zervos Catalog. The judge accordingly "[a]ward[ed] the [*astreinte*] prounounced by the Paris Court of Appeal[] . . . in the amount of 2,000,000 euros," as well as 1,000 euros in costs.

De Fontbrune then initiated proceedings in California state court seeking recognition of the 2012 Judgment under the Uniform Recognition Act. Wofsy removed the action to

---

[2] The original judgments are in French. These translations come from the translated versions provided by de Fontbrune.

federal court on diversity grounds, and filed a motion to dismiss under Rule 12(b)(6).

Wofsy's motion contested the characterization of *astreinte* as "damages" in the English versions of the 2001 and 2012 Judgments attached to de Fontbrune's complaint. Wofsy argued that *astreinte* functions as a penalty—not as an award of damages—and is thus not cognizable under the Uniform Recognition Act. In support of this assertion, Wofsy supplied a declaration by a French lawyer, Vonnick le Guillou. De Fontbrune countered with a declaration from his own expert on French law, Christopher Mesnooh, explaining that, in the French system, *astreinte* can function as an award of damages. De Fontbrune also argued that the district court should strike Guillou's declaration as evidence outside the pleadings impermissibly filed in support of a motion to dismiss.

Faced with conflicting information about the function of *astreinte* in French law, the district court initially denied Wofsy's motion in part, concluding that determining whether *astreinte* is a "fine, a penalty, damages, or something else . . . require[d] an analysis of French law" that would be "premature at [the] pleadings stage." The district court also declined to consider Guillou's declaration under Rule 44.1, on the grounds that the Rule did not "expressly allow the Court to consider evidence outside the pleadings on a Rule 12(b)(6) motion," and that a party relying on foreign law bears the burden of proving the content of that law.

After Wofsy filed a motion for reconsideration, together with a reply declaration from Guillou, the district court reversed course. This time around, the district court concluded that "its previous finding concerning judicial

notice of foreign law was in error" and vacated the order denying Wofsy's motion to dismiss. In a complete volte face, the district court reasoned that Rule 44.1 permits judicial consideration of any relevant material or source in determining foreign law, irrespective of its admissibility as evidence. Because "determinations of foreign law are issues of law, not fact," the court also concluded that it could take judicial notice of the declarations of the French legal experts, "insofar as they relate to French law."

Taking these declarations into consideration, the court determined that the primary purpose of the *astreinte* was not to compensate de Fontbrune for the damages he suffered, but to compel Wofsy's compliance with the 2001 Judgment. The court concluded that the *astreinte* thus functioned as a penalty and so was not cognizable under the Uniform Recognition Act. De Fontbrune now appeals from the district court's dismissal of the action with prejudice.[3]

## ANALYSIS

The district court's vacillation illustrates the lingering uncertainty surrounding the role of foreign law in domestic proceedings, even after the advent of Rule 44.1. We take this opportunity to address a question that no circuit has yet answered directly, perhaps because the answer is implicit in the rule: whether Rule 44.1 authorizes district courts to consider foreign legal materials outside the pleadings in

---

[3] While his appeal was pending, de Fontbrune died. His wife and children filed a motion for substitution of party to continue these proceedings as de Fontbrune's successors in interest pursuant to California Civil Procedure Code § 377.32. We grant this motion. For convenience, we refer to the appellants collectively as "de Fontbrune."

ruling on a motion to dismiss. Our answer is yes, because Rule 44.1 treats foreign law determinations as questions of law, not fact.

## I.  Foreign Law under Rule 44.1

Rule 44.1 provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law.

The adoption of Rule 44.1 in 1966 marked a sea change in the treatment of foreign law by the federal courts.  *See Twohy v. First Nat'l Bank of Chi.*, 758 F.2d 1185, 1192–93 (7th Cir. 1985).  Prior to its adoption, foreign law was viewed as a question of fact to "be proved like other facts."  *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 187 (1804) (Marshall, C.J.).  The treatment of foreign law as fact reflected understandable judicial discomfort with questions of foreign law due to inevitable unfamiliarity with the substance and nuance of the legal systems of other countries.  Arthur R. Miller, *Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law:  Death Knell for a Die-Hard Doctrine*, 65 Mich. L. Rev. 613, 619–20 (1967).

Rule 44.1 endeavored to lay to rest this antiquated conception of foreign law as "a question of fact that must be

proved at trial and reviewed on appeal only for clear error." *Rationis Enters. Inc. of Pan. v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 585 (2d Cir. 2005). The Rule achieved this transformation by making the process of ascertaining foreign law equivalent to the process for determining domestic law, insofar as possible. 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2444 (3d ed. 2008); *see also Matter of McLinn*, 739 F.2d 1395, 1398 (9th Cir. 1984) (analogizing treatment of foreign law and treatment of laws of sister states).

Rule 44.1 thus unshackles courts and litigants from the evidentiary and procedural requirements that apply to factual determinations. It accordingly permits courts to consider "any relevant material, including testimony, without regard to its admissibility under Rule 43," authorizes the court to "engage in its own research," eschews any requirement that the court formally take judicial notice of foreign law, and obviates the need for the court to provide "formal notice to the parties of its intention to engage in its own research on an issue of foreign law which has been raised by them, or of its intention to raise and determine independently an issue not raised by them." Fed. R. Civ. P. 44.1 advisory committee's note.

The Rule's requirements are intended to be "flexible and informal" to "encourage the court and counsel to regard the determination of foreign law as a cooperative venture requiring an open and unstructured dialogue among all concerned." Wright & Miller at § 2444. Rule 44.1 exhorts trial and appellate courts alike to make the most of this flexibility to independently research and analyze foreign law—particularly as such issues will undoubtedly continue coming "to the federal courts with increasing frequency as the

global economy expands and cross-border transactions increase." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998); *see also Twohy*, 758 F.2d at 1193 ("In determining [questions of foreign law], both trial and appellate courts are urged to research and analyze foreign law independently.").

We have likewise stressed the district court's independent obligation to adequately ascertain relevant foreign law, even if the parties' submissions are lacking. *See Universe Sales Co., Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1039 (9th Cir. 1999) (noting "it is not novel for an appellate court . . . to determine that a district court performed an inadequate inquiry" into foreign law (citing *Twohy*, 758 F.2d at 1193)). Independent research, plus the testimony of foreign legal experts, together with extracts of foreign legal materials, "has been and will likely continue to be the basic mode" of determining foreign law. *Id.* at 1038. Importantly, such material and testimony may be considered "at any time, whether or not submitted by a party." *Stuart v. United States*, 813 F.2d 243, 250 (9th Cir. 1987), *rev'd on other grounds by United States v. Stuart*, 489 U.S. 353 (1989); *cf Kaho v. Ilchert*, 765 F.2d 877, 881 (9th Cir. 1985) (noting that the traditional prohibition against considering materials not before an agency does not apply to consideration of foreign legal materials under Rule 44.1).

Yet despite Rule 44.1's seemingly clear language, federal courts have largely remained hesitant to engage with questions of foreign law as fully and independently as they do with questions of domestic law—confusion and contradiction continue to plague the application of Rule 44.1. *See, e.g.*, Peter Hay, *The Use and Determination of Foreign Law in Civil Litigation in the United States*, 62 Am. J. Comp. L.

Supp. 213, 235 (2014) (noting the lack of uniformity in application of Rule 44.1).

The application of Rule 44.1 has also been beset by semantic sloppiness. Courts continue to refer to the "burden of proving foreign law." *See, e.g.*, *McGee v. Arkel Int'l., LLC*, 671 F.3d 539, 546 (5th Cir. 2012) (referencing the plaintiff's "burden of proving foreign law" and requiring that litigants "present to the district court clear proof of the relevant legal principles" (internal quotations and citations omitted)); *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (3d Cir. 2006) (explaining that, because Rule 44.1 does not impose a duty on courts to conduct independent research into foreign law, the parties "carry the burden of proving" it). Imposing a burden of proof on the parties is at odds with the mandate of Rule 44.1. To be sure, under Rule 44.1, a party raising a foreign law issue "must give notice by pleading on other writings." But this notice is not tantamount to a burden of proof.

In light of the lingering conflicts in the application of Rule 44.1—and in the absence of any guiding precedent from the higher courts—it is unsurprising that uncertainty surrounds the precise issue of whether it is appropriate for a district court to consider foreign legal materials outside of the pleadings in ruling on a motion to dismiss. District courts addressing this question have—predictably—adopted differing approaches. *Compare Abdallah v. Int'l Lease Fin. Corp.*, 2015 A.M.C. 1137, 1160 (C.D. Cal. 2015) (acknowledging practical considerations that "often require" reliance on evidence concerning substance of foreign law at Rule 12(b)(6) stage), *with United States v. 594,464 Pounds of Salmon, More or Less*, 687 F.Supp. 525, 526 (W.D. Wash. 1987) (treating a motion to dismiss "in accordance with Fed.

R. Civ. P. 12(b) as one for summary judgment," and explaining reluctance to rule on foreign legal questions without "a more complete picture of the [foreign] legal and regulatory system").

Since matters outside the pleadings are often required to determine foreign law, summary judgment may appear at first blush to be the appropriate mechanism for dismissing a claim when foreign law applies. *Grice v. A/S J. Ludwig Mowinckels*, 477 F.Supp. 365, 367 (S.D. Ala. 1979). The continued misplaced emphasis on the parties' burden of proving foreign law, the frequently intertwined factual questions, and the sheer complexity of ascertaining foreign law all might superficially support this conclusion. But it would be antithetical to the language and purpose of Rule 44.1 to prohibit courts from considering relevant materials beyond the pleadings in ruling on a Rule 12(b)(6) motion when the claim depends on a determination of foreign law. This does not preclude the possibility that there may be situations where factual matters underlie the legal determination and that, in such a case, summary judgment may be the appropriate procedural mechanism for resolution.

The general prohibition against looking at matters beyond the complaint to resolve a Rule 12(b)(6) motion ensures that parties have adequate notice to present additional evidence and establish whether there are any genuine issues of material fact to be resolved. *See, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (noting that the rule requiring the conversion of a Rule 12(b)(6) motion to a motion for summary judgment when materials outside the pleadings are considered ensures "that the party against whom the motion to dismiss is made may respond" with evidence of its own). These concerns are not implicated by

the consideration of foreign legal materials at the pleading stage. Under Rule 44.1, rulings on foreign law are determinations of law, not of fact. Accordingly, "even differences of opinion on the content, applicability, or interpretation of [a] foreign provision may not be characterized as a 'genuine issue as to any material fact' . . . ." *Banco de Credito Indus., S.A. v. Tesoreria General*, 990 F.2d 827, 838 (5th Cir. 1993) (quoting John R. Brown, *44.1 Ways to Prove Foreign Law*, 9 Mar. L. Rev. 179, 194 (1984)).

The Rule authorizes courts to conduct independent research outside the parties' submissions in determining foreign law. Its deliberately "flexible procedures for presenting and utilizing material on issues of foreign law," Fed. R. Civ. P. 44.1 advisory committee's note, likewise cut against a determination that district courts should be prohibited from considering relevant foreign legal materials at the motion to dismiss stage.

Importantly, because foreign law interpretation and determination is a question of law, independent judicial research does not implicate the judicial notice and ex parte issues spawned by independent factual research undertaken by a court. *See* Edmund M. Morgan, *Judicial Notice*, 57 Harv. L. Rev. 269, 270–72 (1944) (explaining that, while the "judge is unrestricted in his investigation and conclusion" in determining the content of legal rules, "[t]he situation as to disputed and disputable issues of fact is different," and the judge is not "permitted to make an independent investigation"); *see also Rowe v. Gibson*, 798 F.3d 622, 641 (7th Cir. 2015) (Hamilton, J., dissenting) (noting that looking at facts outside the record "turns the court from a neutral decision-maker into an advocate for one side"); *Blunt v.*

*United States*, 244 F.2d 355, 365 (D.C. Cir. 1957) (warning that adding to the record "t[akes] on the aspect of advocacy").

Judicial research into domestic law provides an appropriate analog. Although our common law system relies heavily on advocacy by the parties, judges are free to undertake independent *legal* research beyond the parties' submissions. It is no revelation that courts look to cases, statutes, regulations, treatises, scholarly articles, legislative history, treaties and other legal materials in figuring out what the law is and resolving legal issues. Independent judicial research into the content of foreign law thus leaves undisturbed a bedrock principle of our adversarial system—that "adversarial testing is the surest route to truth," and the failure to expose facts to such rigorous testing "can undermine the quality of [factual] findings." Brianne J. Gorod, *The Adversarial Myth: Appellate Court Extra-Record Factfinding*, 61 Duke L. J. 1, 3, 6 (2011). Rather, determining foreign law—like determining domestic law—requires "adequate study," without which there can be neither the "adequate reflection" nor "that fruitful interchange of minds which is indispensable to thoughtful, unhurried decision and its formulation in learned and impressive opinions." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 232 (1991) (quoting *Dick v. N.Y. Life Ins. Co.*, 359 U.S. 437, 458–59 (1959) (Frankfurter, J., dissenting)).

Two of our sister circuits appear to have tacitly endorsed this interpretation of Rule 44.1, without explicitly addressing the question before us. In *Baloco ex rel. Tapia v. Drummond Co.*, the Eleventh Circuit considered an expert affidavit on Colombian law that had been submitted to the district court as part of a response to a motion to dismiss under Rule 44.1. 640 F.3d 1338, 1349 n.13 (11th Cir. 2011). Similarly, in

*Twohy*, in considering an appeal arising out of a Rule 12(c) motion for a claim arising under Spanish law, the Seventh Circuit chided the district court for considering only "a series of affidavits of foreign law experts concerning issues of Spanish law relevant to the case," and not "fully me[eting] its duty to ascertain foreign law under Rule 44.1." 758 F.2d at 1192–93.

Thus, we hold that courts do not transgress the broad boundaries established by Rule 44.1 when considering foreign legal materials—including expert testimony and declarations—at the pleading stage, and the district court here did not err in considering expert declarations on the content of French law in ruling on Wofsy's Rule 12(b)(6) motion.

## II. California's Uniform Recognition Act

The district court erred in concluding that "the award of an *astreinte* in this case constitutes a penalty for purposes of the [Uniform Recognition Act]." To explain why this is so, we first review the requirements governing the recognition of foreign-court monetary judgments under California law and then consider the nature of the *astreinte* in the judgment at issue. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) (all questions of law, including questions of foreign law, are reviewed de novo).

California's Uniform Recognition Act governs the enforcement of foreign-country judgments that (1) grant or deny monetary recovery and (2) are "final, conclusive, and enforceable" under the law of the jurisdiction where rendered. Cal. Civ. Proc. Code § 1715(a). A judgment that constitutes "[a] fine or other penalty," however, is not cognizable under the statute. *Id.* § 1715(b)(2). The statutory exclusion of fines

or penalties reflects an ancient maxim of international law that "[t]he Courts of no country execute the penal laws of another." *The Antelope*, 23 U.S. (10 Wheat.) 66, 123 (1825) (Marshall, C.J.); *Hyundai Sec. Co. v. Lee*, 182 Cal. Rptr. 3d 264, 269 (Cal. Ct. App. 2015).

The prescription against recognizing or enforcing penal laws focuses on whether the character of the foreign judgment is essentially punitive or compensatory. *See, e.g.*, Restatement (Second) of Conflicts of Laws § 89 & cmt. a (1971) (explaining that the "narrow" prohibition "applies only to actions brought for the purpose of punishing the defendant for a wrong done by him" and "does not apply to actions brought by a private person . . . to recover compensation for a loss"); Restatement (Third) of Foreign Relations Law § 483 cmt. b (1987) ("A penal judgment . . . is . . . primarily punitive rather than compensatory in character."). The prohibition "reflect[s] a reluctance of courts to subject foreign public law to judicial scrutiny . . . combined with reluctance to enforce law that may conflict with the public policy of the forum state . . . . [and] distrust of foreign criminal procedures." Restatement (Third) of Foreign Relations Law § 483 n.2.

Adopting the test articulated by the Supreme Court in *Huntington v. Attrill*, 146 U.S. 657 (1892), the California courts likewise concentrate on the character of a foreign judgment. *Java Oil Ltd. v. Sullivan*, 86 Cal. Rptr. 3d 177, 183 (Cal. Ct. App. 2008). In *Huntington*, the Supreme Court explained that determining whether a foreign law is "a penal law, in the international sense, so that it cannot be enforced in the courts of another state, depends upon . . . whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to a person injured by

the wrongful act." 146 U.S. at 673–74. This inquiry entails consideration of whether the harm the foreign judgment seeks to redress is private or public. Private harms "are an infringement or privation of the private or civil rights belonging to individuals, considered as individuals," whereas public harms "are a breach and violation of public rights and duties, which affect the whole community, considered as a community." *Id.* at 668–69 (quoting 3 William Blackstone, Commentaries \*2).

The Court acknowledged the elasticity of the terms "penal" and "penalty" in both the British and American systems, noting that, while these terms "[s]trictly and primarily . . . denote punishment . . . imposed and enforced by the state for a crime or offense against its laws," they also commonly encompass "any extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged." *Id.* at 666–67. The Court emphasized that, for purposes of recognition and enforcement, "[p]enal laws, strictly and properly, are those imposing punishment for an offense committed against the state, and which . . . the executive of the state has the power to pardon." *Id.* at 667. In contrast, "[s]tatutes giving a private cause of action against the wrongdoer are sometimes spoken of as penal in their nature, but . . . neither the liability imposed nor the remedy given is strictly penal." *Id.*

The Court cautioned against being misled by nomenclature, emphasizing that the crux of the analysis is not whether a judgment is termed penal or a penalty by "the courts of the [country] in which it was passed, but whether it appears, to the tribunal which is called upon to enforce it, to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a

private person." *Id.* at 683. This admonition recognizes that translation will always be incomplete, because the "resonances from centuries of legal, political, and literary use" that necessarily accompany any legal term can never be fully transferred by translation alone. John E. Joseph, *Indeterminacy, Translation and the Law*, *in* 8 Translation and the Law 13, 17 (Marshall Morris ed., 1995).

In undertaking the *Huntington* inquiry, California uses a nuanced balancing test to determine whether the "essential character and effect" of an award is penal—an approach that acknowledges that courts must consider more than how a term is translated to understand the nature of a foreign judgment. The *Java Oil* test thus looks to a number of factors, including: (1) whether the purpose of the award is to compensate an individual or to "provide an example" or punish "an offense against the public"; (2) whether the award is payable to an individual or to the state or one of its organs; (3) whether the judgment arose in the context of a civil action or through the enforcement of penal laws; and (4) whether the award was a "mandatory fine, sanction, or multiplier." *Java Oil*, 86 Cal. Rptr. 3d at 183–84; *see also Hyundai*, 182 Cal. Rptr. 3d at 270–71 (relying on *Java Oil* factors in determining whether a foreign judgment was a penalty).

No one factor is determinative, and, not surprisingly, the same factors may point in differing directions. In *Hyundai*, for example, Hyundai Securities sought enforcement of a Korean judgment that included indemnification for a criminal fine the company had paid on behalf of Ik Chi Lee, its former CEO. 182 Cal. Rptr. 3d at 266–67. Lee argued that, because the indemnification order was based on a criminal fine, it was penal in nature and not cognizable under the Act. *Id.* at 267. The California Court of Appeal disagreed, reasoning that the

purpose of the Korean judgment was "to compensate Hyundai for the damages it suffered from having to pay a fine," and that "the prohibition against the recognition of a judgment based on a fine . . . does not include an award to compensate a plaintiff." *Id.* at 1387, 1389.

### III.   The Nature of the *Astreinte* in the French Judgment against Wofsy

With the *Java Oil* factors in mind, we turn to the nature of the *astreinte* in the French legal system generally and more particularly in the judgment against Wofsy.  Heeding our own advice, we consider the judgment itself, the expert declarations and materials on the *astreinte* submitted to the district court by de Fontbrune and Wofsy, as well as our own research into American and French law.

At the outset, we note that the *astreinte* is a "device that may appear rather strange" to common law lawyers.  *An Introduction to French Law* 234 (George A. Bermann & Etienne Picard eds., 2008).  It currently occupies a role of considerable procedural and substantive complexity.  M.P. Mitchell, *Imperium by the Back Door: The* Astreinte *and the Enforcement of Contractual Obligations in France*, 51 U. Toronto Fac. L. Rev. 250, 259 (1993).  Unsurprisingly, then, the *astreinte* cannot be neatly categorized as either essentially penal or wholly civil in nature.  It is hybrid, with elements that cut both ways.

To begin, we emphasize that we cannot ascertain whether the *astreinte* is a "fine or other penalty" simply by turning to translations or dictionary definitions.  Citing the *Dictionnaire Juridique Français-Anglais* and the *Council of Europe French-English Legal Dictionary*, Wofsy's counsel argued

that "*astreinte* means a fine for noncompliance with a judgment." But the test is not whether *astreinte* is translated as "fine" or "penalty." Rather, we must look to "whether it appears, to the tribunal which is called upon to enforce it, to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person." *Huntington*, 146 U.S. at 683. Dictionaries may be a starting point, but in this case are of limited utility in looking beneath the surface to determine the "essential character and effect" of the foreign judgment. Indeed, the limitations of terminology for understanding the character and purpose of a foreign award is reflected in the nuanced nature of the *Java Oil* test. Although the Uniform Recognition Act prohibits recognition of a "fine[] or other penalty," the *Java Oil* factors do not rely on this vocabulary to determine what judgments fall within the Act's exception to enforcement. We must accordingly be cautious about falling back on bald nomenclature as providing a definitive category in lieu of undertaking the in-depth analysis of foreign judgments required by *Java Oil*.

The declarations of the parties' French-law experts illustrate the variegated character of the *astreinte*. The statements of the experts and argument by counsel conjure up an image of one side pointing a finger one way, and the other side pointing a finger in the opposite direction. On the one hand, the Guillou declarations take the position that the *astreinte* is awarded "independent of damages," calculated based on the behavior of the defendant rather than injury to the plaintiff. Its purpose is thus not, strictly speaking, to compensate for actual pecuniary harm. Rather, it operates as a sort of "private penalty," intended to deter and punish non-compliance with the court's judgment. Although Guillou describes the *astreinte* as a means to vindicate the public

interest in compliance with court orders, she does not suggest that the order was intended to punish an "offense against the public." Thus, Guillou characterizes the *astreinte* as a "private penalty" that is a "personal legal measure of constraint." But of course, invoking the word "penalty" without benchmarking it against the *Java Oil* analysis does not answer the question.

On the other hand, the Mesnooh declaration states that the *astreinte* is "imposed by a judge, always for an amount of money, ordering a party which is subject to a court order to do something . . . to comply with such order." An *astreinte* can thus be awarded only in connection with a valid and enforceable legal duty. According to Mesnooh, the *astreinte* is a "personal remedy," payable entirely to the party seeking enforcement of an *astreinte*, not to the court or any other part of the French State. The amount is "within the discretion of the judge," and "can be modified before it is reduced to judgment." Although not "a grant of a civil right to a private person," the *astreinte* is not a punishment for a crime against the public, either. It is awarded, rather, "for the sole benefit of" the party seeking the remedy.

The experts' recitations, which sometimes overlap, are useful in laying out some of the characteristics of the *astreinte*. However, with the exception of parts of the Mesnooh declaration, they do not provide the answer to our state law inquiry. Additional explanatory materials indicate that French judges devised the *astreinte* as a "coercive sanction which operates in its own right to secure enforcement of a judgment." Michael Chesterman, *Contempt: In the Common Law but not the Civil Law*, 46 Int'l & Comp. L. Q. 521, 545 (1997). The *astreinte* is now widely used in the French legal system "to obtain the performance of

any type of obligation . . . for matters civil or commercial, and also in administrative matters including those in which the party owing performance is the state or a public body." James Gordley & Arthur von Mehren, *An Introduction to the Comparative Study of Private Law* 533 (2006). In this regard, as Guillou noted, *astreinte* can be seen as analogous to contempt of court.[4] The protean nature and wide applicability of *astreinte* warns against a blanket determination that the device is always either punitive or compensatory. Rather, we must consider a particular *astreinte* in the context in which it was awarded.

Turning to the first *Java Oil* factor, the context of the French orders here persuades us that the purpose of the *astreinte* awarded to de Fontbrune was not to punish "an offense against the public" or make an example of Wofsy, *see* 86 Cal. Rptr. 3d at 183, but to safeguard de Fontbrune's copyright. The 2001 Judgment prohibited Wofsy from using the Zervos photographs "under penalty of [*astreinte*] of 10,000 francs" per violation. The court concluded that Wofsy had infringed de Fontbrune's copyright in the Zervos Catalog in violation of Articles L335-2 and L335-3 of the French Intellectual Property Code. According to these articles "any reproduction by any means of a work of the mind, any edition of writings, musical compositions, drawings, paintings, or any other printed or engraved production made in violation of

---

[4] The functional similarity between the *astreinte* and contempt of court of course does not answer whether the *astreinte* here is designed to "punish an offense against the public," or is in the nature of a "grant of a civil right to a private party." Contempt may be civil or penal, and even within our own system, "parsing coercive civil and criminal contempt" orders is no easy matter. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 836 (1994). Superficial comparisons between judicial devices in divergent legal systems cannot answer that question.

rules protecting the authors' right is an infringement: any infringement is an offence." Nicolas Bouche, *Intellectual Property Law in France* ¶ 294 (2d ed. 2014). Such infringements "may entail criminal and civil sanctions" as remedies. *Id.* at ¶ 324. The criminal sanctions include "a term of three years imprisonment and a fine of EUR 300,000." *Id.* at ¶ 325. We note that the word translated here as "fine" is "*amende*"—not *astreinte*—in the original French version. Code de la propriété intellectuelle [Intellectual Property Code] art. L335-2. The civil remedies include both damages and an order requiring "cessation of the infringing acts." Bouche, *supra*, at ¶ 333. Such an order enjoining the infringing acts may be made, if necessary, under "*astreinte*." Code de la propriété intellectuelle [Intellectual Property Code] art. L331-1–2.

In the 2001 Judgment, the Paris Court of Appeal awarded both forms of civil remedies—that is, pecuniary damages for de Fontbrune's injury and an injunction against future reproductions of the Zervos Catalog images under an *astreinte*. The court did not, however, impose any of the criminal sanctions provided for in the Intellectual Property Code. Thus, the *astreinte* was not awarded pursuant to the court's authority to criminally punish copyright violations under the Intellectual Property Code through imposing an *amende*.

The *astreinte* was awarded separately and apart from the pecuniary damages awarded by both the Paris Court of Appeal and the enforcement judge. The enforcement judge expressly referenced Articles 35 and 36 of the Law of 9 July

1991,[5] pursuant to which any French judge could order *liquidation d'astreinte*, "taking into consideration the behaviour of the party to whom the injunction has been addressed, and the difficulties that he or she has encountered in executing it."

Ultimately, the purpose of the *astreinte* was to set a sum, per violation, for Wofsy's failure to comply with the judicial prohibition on the continued use of de Fontbrune's copyrighted photographs. In this sense, it may be likened to a civil contempt order. The California Supreme Court has clarified that the primary object of civil contempt "is to protect the rights of litigants. . . . Civil contempt is a forward-looking remedy imposed to coerce compliance with a lawful order of the court." *In re Nolan W.*, 203 P.3d 454, 466 (Cal. 2009) (internal quotations and citations omitted). Civil contempt orders are thus "remedial, and for the benefit of the [plaintiff]." *Bagwell*, 512 U.S. at 828–29 (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911)). Here, as Guillou pointed out, the *astreinte* was a "*personal* legal measure of constraint," for de Fontbrune's benefit; in other words "a forward-looking remedy imposed to coerce compliance with" the Paris Court of Appeal's lawful order to stop Wofsy using de Fontbrune's copyrighted images.

Cast in another light, the *astreinte* here may also be seen as fulfilling a function akin to statutory damages in American copyright law, although we acknowledge that de Fontbrune

---

[5] We note that the Law of 9 July 1991 was modified in 1992 and abrogated in 2011. *See* Loi 92-644 du 13 juillet 1992, Journal Officiel de la République Française, July 14, 1992, art. 3; Ordonnance 2011-1895 du 19 décembre 2011, Journal Officiel de la République Française, Dec. 20, 2011, art. 4.

was awarded damages separately.  In the U.S. system, a party may opt for an award of statutory damages rather than actual damages.  17 U.S.C. § 504(c)(1).  Such damages are intended to induce copyright holders to enforce their copyrights and to deter infringers by preventing unjust enrichment, even where actual damages are unproved.  Roger D. Blair & Thomas F. Cotter, *An Economic Analysis of Damages Rules in Intellectual Property Law*, 39 Wm. & Mary L. Rev. 1585, 1651–52 (1998).   Here, too, the *astreinte* was awarded without determining the actual amount of pecuniary harm suffered by de Fontbrune as a result of Wofsy's continued use of the Zervos Catalog images.  Nevertheless, the purpose of the award was not to punish a harm against the public, but to vindicate de Fontbrune's personal interest in having his copyright respected and to deter further future infringements by Wofsy.

The remaining *Java Oil* factors weigh in favor of our conclusion that the *astreinte* was not essentially penal in nature.  Significantly, the *astreinte* awarded was payable directly to de Fontbrune, rather than to a court or the French state.  As the Mesnooh declaration noted, an *astreinte* creates a "debt belonging to the party which is condemned [to pay the *astreinte*]."  The result is that "the beneficiaries of the underlying award [for damages] becomes a creditor for the amount of the *astreinte*."  *See* Francois Chabas, *Régime de la Réparation: JurisClasseur Civil Code Article 1382–1386* ¶ 97 (2001).

Turning to the nature of the proceedings, the *astreinte* here was awarded in the context of a civil action in order to enforce a civil remedy provided for in the French Intellectual Property Code.  No criminal or penal proceedings were involved.  And, finally, the award was not a mandatory fine,

sanction or multiplier. Indeed, an *astreinte*'s "effectiveness is . . . a function of the choice of the amount which is freely determined by the judge." Gordley & von Mehren, *supra*, at 532. In fact, the enforcement judge accepted a reduction of the *astreinte* to 2,000,000 euro, which is consistent with the notion that she retained final discretion to determine the amount. In all, the *astreinte* was not essentially "a punishment of an offense against the public;" rather, it "afford[ed] a private remedy to [de Fontbrune,] a person injured by the wrongful act." *See Huntington*, 146 U.S. at 673–74, 683.[6]

---

[6] While the French characterization of the *astreinte* is not determinative of whether the *astreinte* is penal or remedial under U.S. law, we note that our conclusion is reinforced by a decision of the French high court noting the civil nature of the device. The French case centered on the enforceability of a $13 million penalty imposed on an American citizen and French resident, Richard Blech, for his role in a Ponzi scheme. The scheme resulted in an estimated $200 million in damages to the victims. *S.E.C. v. Credit Bancorp, Ltd.*, No. 99 CIV 11395 RWS, 2000 WL 1752979 (S.D.N.Y. 2000). A U.S. court ordered Blech to cooperate with the receiver appointed to trace Blech's assets under penalty of $100 dollars per day, doubled each day for noncompliance. Order, *Credit Bancorp*, No. 99 CIV 11395 RWS, 2000 WL 1752979 (S.D.N.Y. 2000) (No. 188). Four months later, the receiver applied for an accounting and the U.S. court ordered Blech to pay approximately $13 million in penalties. Order, *Credit Bancorp*, No. 99 CIV 11395 RWS, 2000 WL 1752979 (S.D.N.Y. 2000) (No. 333). The receiver sought to enforce the award in France. In reasoning that mirrors our own, the *Cour de cassation* characterized the $13 million penalty as an *astreinte*, and concluded that, because an *astreinte* is civil in nature, the penalty was enforceable. *See* Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Jan. 28, 2009, Bull. civ. I, No. 15 (Fr.) (calling the $100 daily penalty "une astreinte" and explaining "la condemnation . . . au paiement d'une somme d'argent à titre de sanction du non respect d'une injonction du juge étranger constituait une décision de nature civile"). For a translation of the relevant portions of the French opinion, see Benjamin West Janke &

Our conclusion is buttressed by contrasting the nature of the *astreinte* awarded here with another case in which our court considered in dicta the character of an *astreinte* imposed under French criminal law and in a different context. The case of *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme* arose from the availability in France of Nazi-related memorabilia on Yahoo!'s auction site. 433 F.3d 1199, 1202 (9th Cir. 2006) (en banc) (per curiam). A French court issued an injunction ordering Yahoo! to remove access to the memorabilia or pay 100,000 euros per day of delay. *Id.* at 1203. Yahoo! claimed that "the threat of a monetary penalty h[ung over it] like the sword of Damocles." *Id.* at 1218. We stated that "even if the French court were to impose a monetary penalty against Yahoo!," it is "exceedingly unlikely" that it would be an enforceable penalty under the Uniform Recognition Act. *Id.* at 1218.

Four factors suggested that the *astreinte* at issue in *Yahoo!* was penal rather than compensatory in character. First, the word *astreinte* was consistently translated as "penalty."[7] *Id.* at 1219. Second, the sanctions were imposed for violations of the French Penal Code, "which declares it a 'crime' to exhibit or display Nazi emblems, and which

---

François-Xavier Licari, *Enforcing Punitive Damage Awards in France after* Fountaine Pajot, 60 Am. J. Comp. L. 775, 799 (2012).

[7] We emphasize again that translation alone is insufficient to capture the "essential character and effect" of a foreign judgment. The translation of *astreinte* as "penalty" in the French order at issue in *Yahoo!* does not compel a conclusion that the *astreinte* at issue here is essentially penal in character. We decline to hold that an *astreinte* is necessarily penal in nature; instead, future courts should be left to consider under *Java Oil* whether an *astreinte* operates to punish or to compensate in the context of a particular case.

prescribes a set of 'criminal penalties,' including fines." *Id.* In other words, the penalty in *Yahoo!* was imposed for "a breach and violation of public rights and duties, which affect the whole community, considered as a community." *Huntington*, 146 U.S. at 668–69 (quoting 3 William Blackstone, Commentaries *2). Third, the penalties imposed by the French court were expressly intended to deter Yahoo! from creating a "threat to internal public order"—obviously, an issue of public interest affecting the whole community, not solely related to a private dispute. *Yahoo!*, 433 F.3d at 1220. As we noted, such judgments "designed to deter conduct that constitutes a threat to the public order are typically penal in nature." *Id.* Finally, the *astreinte* was payable to the government and not a private individual or group—further underscoring the public nature of award. *Id.* Here, in contrast, the *astreinte* was imposed in the context of a civil action for contravening an injunction against the use of copyrighted materials and was payable to the individual copyright holder.

For the foregoing reasons, we hold that the *astreinte* awarded by the French courts to de Fontbrune falls within the Uniform Recognition Act as a judgment that "[g]rants . . . a sum of money." Cal. Civ. Proc. Code § 1715(a)(1). In this case, the *astreinte* was not a "fine or other penalty" for purposes of the Act, *id.* § 1715(b)(2), and accordingly the district court erred in concluding otherwise.

**REVERSED AND REMANDED.**