IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

THE STATE OF THE NETHERLANDS, *Plaintiff/Appellee*,

*v.*

MD HELICOPTERS INC., *Defendant/Appellant*.

No. 1 CA-CV 19-0019
FILED 3-19-2020

Appeal from the Superior Court in Maricopa County
No. CV2015-095127
The Honorable Joshua D. Rogers, Judge
The Honorable Margaret Benny, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Davis Miles McGuire Gardner, PLLC, Tempe
By Bradley D. Weech (argued), Robert N. Sewell, and Marshall R. Hunt
*Counsel for Plaintiff/Appellee*

Williams & Connolly LLP, Washington, D.C.
By Ana C. Reyes
*Co-Counsel for Defendant/Appellant*

Dentons US LLP, Phoenix
By Karl M. Tilleman, Erin Bradham, and Douglas D. Janicik (argued)
*Co-Counsel for Defendant/Appellant*

**OPINION**

Presiding Judge Paul J. McMurdie delivered the Opinion of the Court, in which Judge Jennifer B. Campbell and Vice Chief Judge Kent E. Cattani joined.

**M c M U R D I E**, Judge:

**¶1**        MD Helicopters, Inc., ("MD Helicopters") appeals from the superior court's order granting summary judgment in favor of the State of the Netherlands, denying MD Helicopters' cross-motion for summary judgment, and entering a judgment domesticating and recognizing two money judgments obtained by the Netherlands in the Dutch courts. We affirm and hold: (1) a final judgment obtained in a Dutch court is recognizable under Arizona's version of the Uniform Foreign-Country Money Judgments Recognition Act, Ariz. Rev. Stat. ("A.R.S.") §§ 12-3251 to -3254 (the "Act"), because the Netherlands has a reciprocal law related to foreign-country money judgments that is similar to the Act; and (2) the money judgments obtained by the Netherlands can be recognized because they are not a fine or other penalty prohibited under the Act.

## FACTS AND PROCEDURAL BACKGROUND

### The Netherlands Proceedings

**¶2**        The facts are generally undisputed. Around March 2001, the Netherlands' *Korps landelijke politiediensten*, or National Police Services Agency (the "National Police"), entered a contract with Helifly, nv. ("Helifly"), a subsidiary of MD Helicopters, for the sale of eight twin-engine helicopters (the "supply contract"). Under the terms of the supply contract, Helifly was required to deliver the helicopters according to an agreed-upon schedule, notify the National Police immediately if there was any threat of delay or divergence from the schedule, and propose measures to remedy any delay. If the contractual delivery schedule was not met and the National Police did not accept the delay, or if Helifly breached the supply contract in some other manner, the National Police were entitled to a "penalty" of 0.1% of the total amount of the contract per day for the breach, up to a maximum of 10% of the contract (the "penalty clause"). The penalty clause also provided that the National Police reserved the right to seek a determination of actual damages "in so far as the loss exceeds the amount

of the penalty." The contract also contained forum-selection and choice-of-law clauses designating the Netherlands as the agreed-upon forum and Dutch law as the governing law.

¶3 After the supply contract was executed, a dispute arose between the parties concerning Helifly's ability to meet the contractual delivery schedule. MD Helicopters intervened and, to remedy any delay, entered a contract with the National Police to loan it two helicopters. Although MD Helicopters and the National Police originally intended the loan to last only six months, after Helifly continued to struggle to meet its delivery obligations under the supply contract, the parties extended the loan contract through June 30, 2004. As Helifly's failure to meet its commitments continued, MD Helicopters, Helifly, and the National Police agreed to set March 1, 2005, as the date for delivery of the first two helicopters contemplated by the supply contract. According to that agreement, MD Helicopters and Helifly were required to loan the National Police two more helicopters. MD Helicopters was also required to enter a second loan contract for one of the two helicopters initially loaned to the National Police. By March 1, 2005, however, Helifly still had not delivered the helicopters to the National Police.

¶4 Ultimately, these disputes triggered two Dutch court proceedings. First, in August 2006, MD Helicopters filed suit against the National Police in the District Court of The Hague[1] for allegedly breaching the first loan contract by failing to return one of the loaned helicopters. The National Police counterclaimed, alleging MD Helicopters breached the second loan contract by failing to deliver the two additional helicopters contemplated by that contract. In December 2008, the court issued a judgment rejecting MD Helicopters' breach-of-contract claim, granting the National Police's counterclaim in part, and ordering MD Helicopters to pay: (1) €1,097,654 in damages incurred by the National Police as a result of MD Helicopters breach of the second loan contract plus interest; (2) €440 in costs; and (3) €1356 in attorney's fees.

¶5 Second, the National Police instituted legal proceedings in 2008 against MD Helicopters in the District Court of The Hague to enforce

---

[1] This opinion uses the capitalization conventions for "The Hague" adopted by the United States Government Publishing Office. U.S. Government Publishing Office, Style Manual ch. 3, § 3.12 (2016), https://www.govinfo.gov/content/pkg/GPO-STYLEMANUAL-2016/pdf/GPO-STYLEMANUAL-2016.pdf.

an alleged guarantee by MD Helicopters of Helifly's obligations under the supply contract. The National Police sought judgment for the amount owed under the penalty clause of the supply contract and for damages "incurred and to be incurred . . . as a result of Helifly's breach and the following termination of the agreement, all to the extent that the damage exceeds the penalties incurred." In February 2009, the court issued a judgment in favor of the National Police and ordered MD Helicopters to pay: (1) €4,931,640 plus interest, under the penalty clause of the supply contract; (2) €4884 in costs; and (3) €6422 in attorney's fees. The court also found that the National Police had met its burden under Dutch law to show it was "sufficiently plausible . . . that the damages incurred . . . exceed the amount of the decision regarding the . . . penalty" and that further proceedings for the determination of damages were warranted.

¶6        Both parties appealed the judgments to The Hague Court of Appeal. In May 2012, the court issued a consolidated judgment upholding the 2008 judgment in full and the 2009 judgment on all but the amount owed by MD Helicopters under the penalty clause, which it increased to €5,868,653 plus interest. The court also ordered MD Helicopters to pay €6774 in costs and €48,090 in attorney's fees. Neither party sought review of the court's judgment (the "Hague Judgment"), and it is considered final and enforceable in the Netherlands.

**The Arizona Proceedings**

¶7        In August 2015, the Netherlands, as assignee of the Hague Judgment, brought an action in the superior court seeking recognition of the judgment in Arizona under both the Act and common-law principles governing the recognition of foreign-country judgments. MD Helicopters moved to dismiss arguing that the Netherlands had failed to satisfy the requirements of the Act by failing to show that the judgment had originated from a foreign country that had adopted or enacted a reciprocal law related to foreign-country money judgments similar to the Act. A.R.S. § 12-3252(B)(2); *see also* A.R.S. § 12-3252(C) ("The party seeking recognition of a foreign-country judgment has the burden of establishing that this chapter applies to the foreign-country judgment."). MD Helicopters also argued that the Act displaced Arizona common law concerning the recognition of foreign-country judgments, thus precluding any avenue for recognition of the Hague Judgment except through the Act. The Netherlands responded that Dutch courts recognized foreign judgments under a test with similar requirements to the Act, and the Arizona legislature did not intend for the Act to abrogate Arizona common law.

¶8        The superior court denied MD Helicopters' motion to dismiss and entered an order recognizing the Hague Judgment. The court found that the Netherlands had shown that Dutch law allows the recognition of foreign judgments and uses requirements like those in the Act. MD Helicopters moved to vacate the portion of the order recognizing the Hague Judgment because it had not been allowed to assert any relevant defenses against recognition under the Act. MD Helicopters also filed its answer to the amended complaint, raising, *inter alia*, the following affirmative defenses: (1) the Act could not apply to the Hague Judgment because the judgment constituted a "fine or other penalty," which cannot be recognized under the Act, A.R.S. § 12-3252(B)(1)(b); and (2) the Hague Judgment and the causes of action on which it was based should not be recognized because they were repugnant to the public policy of Arizona and the United States, A.R.S. § 12-3253(C)(3). The court granted MD Helicopters' motion to vacate its order and transferred the case to a different judicial officer.[2]

¶9        The Netherlands ultimately moved for summary judgment arguing: (1) the previous judicial officer's ruling on the applicability of the Act and common law related to the recognition action was the law of the case; (2) the Hague Judgment was not a "penalty" as defined by the Act; and (3) MD Helicopters had failed to show the Hague Judgment was repugnant to the public policy of either Arizona or the United States. MD Helicopters responded and cross-moved for summary judgment on all issues other than the prior ruling. On that point, MD Helicopters agreed that the issues decided in the prior order applied to the cross-motions for summary judgment but reserved its right to challenge those issues on appeal, if necessary.

¶10        In June 2018, the superior court granted the Netherlands' motion and denied MD Helicopters' cross-motion. In its ruling, the court held that the Hague Judgment, though originating mostly from the penalty clause of the supply contract, did not constitute a penalty within the context of the Act. The court also held that, in the exercise of its discretion, it would not refuse to recognize the Hague Judgment on public policy grounds under the Act. The court then issued a judgment: (1) domesticating and recognizing the Hague Judgment; (2) granting judgment for the amount of

---

[2]        The judicial officer originally presiding over the recognition matter was a court commissioner acting as a judge *pro tempore*. As a *pro tempore* judge, she had the same authority as a full-time regularly seated superior court judge. *See* Ariz. Const. art. 6, § 31(B); *State v. White,* 160 Ariz. 24, 32 (1989); *Vera v. Rogers*, 246 Ariz. 30, 35, ¶ 19, n.5 (App. 2018).

$14,724,084, which included principle damages and accrued interest less partial payments made toward the judgment; (3) affirming the attorney's fees and costs of $72,799 as awarded in the Hague Judgment; and (4) granting attorney's fees of $350,000 and taxable costs in the amount $665.

**¶11**        MD Helicopters appealed the superior court's judgment, and we have jurisdiction under A.R.S. § 12-2101(A)(1).

## DISCUSSION

**¶12**        We review a grant of summary judgment and issues of statutory interpretation *de novo*. *BMO Harris Bank, N.A. v. Wildwood Creek Ranch, LLC*, 236 Ariz. 363, 365, ¶ 7 (2015). Because the superior court's determination on the question of a foreign country's law is "treated as a ruling on a question of law," we also review such issues *de novo*, Ariz. R. Civ. P. 44.1, and may conduct our "own independent research and analysis" to determine the answer to the relevant question, *Kadota v. Hosogai*, 125 Ariz. 131, 136–37 (App. 1980). Summary judgment should be granted when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a).

## A. Through Long-standing and Consistent Court Interpretation of Dutch Law, the Netherlands Has Adopted a Reciprocal Law Related to Foreign-Country Money Judgments that is Similar to the Act.

**¶13**        Our goal in interpreting the Act is to "effectuate the legislature's intent," and the "best indicator of that intent is the statute's plain language." *SolarCity Corp. v. Ariz. Dep't of Revenue*, 243 Ariz. 477, 480, ¶ 8 (2018). "When the plain text of a statute is clear and unambiguous there is no need to resort to other methods of statutory interpretation to determine the legislature's intent because its intent is readily discernible from the face of the statute." *Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 325, ¶ 8 (2011). "Statutory terms, however, must be considered in context." *Id.* We must also construe words and phrases "according to the common and approved use of the language." A.R.S. § 1-213.

**¶14**        The Act is based on the Model Uniform Foreign-Country Money Judgments Recognition Act (the "Model Act"). The Model Act, then known as the Uniform Foreign Money Judgments Recognition Act, was first drafted by the National Conference of Commissioners on Uniform State Laws in 1962 and was revised into its current form in 2005. Model Act prefatory note (Nat'l Conference of Commissioners on Unif. State Laws

2005).[3] The goal of the Model Act is to "codif[y] the most prevalent common law rules with regard to the recognition of money judgments rendered in other countries." *Id.* By doing so, the Model Act seeks to increase the likelihood that foreign countries would recognize judgments issued in adopting states. *Id.* The act "delineates a minimum of foreign-country judgments that must be recognized by the courts of adopting states," and provides several rules to govern the recognition process. *Id.* These rules include provisions that describe: (1) the types of judgments to which the Model Act applies, *id.* § 3; (2) mandatory and discretionary bases for refusing to recognize a foreign-country money judgment, *id.* § 4; (3) how and in what proceeding recognition can be sought, *id.* § 6; (4) the effect of recognition of a foreign-country money judgment, *id.* § 7; (5) a uniformity-of-interpretation clause to encourage consideration of other states' interpretations of the act, *id.* § 10; and (6) a savings clause to ensure the act is not interpreted as barring recognition of a foreign-country judgment under common-law principles of comity or other relevant doctrines, *id.* § 11.

**¶15** Our legislature adopted the Act in 2015. *See* 2015 Ariz. Sess. Laws, ch. 170, § 1 (1st Reg. Sess.); *see also* A.R.S. §§ 12-3251 to -3254. The Act mirrors the Uniform Law Commission's language and structure in all but three areas. First, our legislature inserted a reciprocity provision requiring the foreign-country money judgment originate from a country that has "enacted or adopted a reciprocal law related to foreign-country money judgments that is similar to [the Act]." A.R.S. § 12-3252(B)(2). Second, our legislature declined to adopt the uniformity-of-interpretation provision. Finally, the Act does not contain the savings clause suggested by the drafters of the Model Act. Other states have also made similar changes to the Model Act. *See* Mass. Gen. Laws ch. 235, § 23A (Massachusetts) (requiring reciprocity); Fla. Stat. §§ 55.601–607 (Florida) (omitting uniformity-of-interpretation and savings clauses); N.D. Cent. Code Ann. §§ 28-20.3-01 to -09 (North Dakota) (omitting savings clause).

---

[3] The Model Act is publicly available at https://www.uniformlaws.org/viewdocument/final-act-with-comments-124?CommunityKey=ae280c30-094a-4d8f-b722-8dcd614a8f3e&tab=librarydocuments (last visited Mar. 11, 2020).

### 1. "A Reciprocal Law" Can Include Caselaw and Court Practice.

¶16      MD Helicopters claims that to satisfy the Act's reciprocity requirement, a treaty, statute, or other codified law that is like the Act must be enacted or adopted by a foreign country's legislative body. MD Helicopters asserts that the Hague Judgment cannot be recognized because the Netherlands only presented evidence of a test for recognition of foreign-country money judgments based on the judicial decisions of the Dutch courts, and did not show that the Netherlands' legislative body has implemented any such law. We do not read the reciprocity requirement so narrowly.

¶17      MD Helicopters' conclusion that A.R.S. § 12-3252(B)(2) only applies to the actions of a foreign country's legislative body hinges on two points. First, MD Helicopters claims that the definition of "foreign country" in the Act excludes courts as part of the foreign government. Second, MD Helicopters contends that the phrase "adopted or enacted a reciprocal law" must refer to the legislative body of a foreign country, and not its courts, because the ordinary meaning of the terms "enact" and "adopt" "denote the official actions of a foreign country's lawmaking body."

¶18      We reject the argument that the Act's definition of "foreign country" excludes a foreign government's courts. MD Helicopters relies on A.R.S. § 12-3251(1)(c), which defines "foreign country" as, *inter alia*, "a government other than":

> Any other government with regard to which the decision in this state as to whether to recognize a judgment of that *government's courts* is initially subject to determination under the full faith and credit clause of the United States Constitution.

(Emphasis added.) MD Helicopters argues that the use of the phrase "government's courts" in this subsection means that the term "government" under the Act, and, by extension the definition of "foreign country" itself, must not include a foreign country's courts, or else the use of the word "courts" would be rendered superfluous. *See Cont'l Bank v. Ariz. Dep't of Revenue*, 131 Ariz. 6, 8 (App. 1981) ("Statutes should be interpreted, whenever possible, so that no clause, sentence, or word is rendered superfluous, void, contradictory, or insignificant."). But MD Helicopters' reading is at odds with the plain meaning of the phrase "government's courts" because the use of the possessive "government's" indicates that

"courts" are a part of the government. This reading does not render the word "courts" superfluous. The statute's reference to the government's "courts," and not another arm of the government, is necessary because it is the *judgments* of that government's courts that determine whether the government constitutes a "foreign country" under the subsection. There would be no reason to examine the judgments of a government's courts to determine if a government is a "foreign country" if "a government" did not also include its courts. Thus, a "foreign country" consists of a government's courts, and this definition does not support MD Helicopters' proffered interpretation of A.R.S. § 12-3252(B)(2).

¶19        MD Helicopters' argument regarding the meaning of the terms "enact" and "adopt" is similarly unpersuasive on the question of whether A.R.S. § 12-3252(B)(2) refers only to acts of a foreign country's legislative body, and not of its courts as well. The common usage of the term "enact" does not generally include the actions of a court. *See, e.g.*, 2015 Ariz. Sess. Laws, ch. 170, § 1 (1st Reg. Sess.) ("Be it *enacted* by the Legislature of the State of Arizona . . . ." (emphasis added)); *Cronin v. Sheldon*, 195 Ariz. 531, 537 (1999) ("[T]he legislature has the authority to enact laws."). But the term "adopt" is not nearly so limited. Courts make law through the adoption of rules or common-law principles. *See, e.g.*, *Carrow Co. v. Lusby*, 167 Ariz. 18, 24 (1990) ("We *adopt* the modern common law view that an owner of livestock owes a duty of ordinary care to motorists traveling on a public highway in open range." (emphasis added)); *Judson C. Ball Revocable Tr. v. Phoenix Orchard Grp. I, L.P.*, 235 Ariz. 519, 523–24, ¶¶ 11, 16 (App. 2018) (Finding Delaware courts' decision to "adopt" rule of standing for shareholder suits "as a matter of common law" persuasive and deciding to "adopt" that rule as well). Executive agencies are also frequently empowered by the legislature to "adopt" rules and regulations. *See, e.g.*, A.R.S. § 23-361 (Industrial Commission "may *adopt* such rules and regulations as necessary" to administer and enforce statutes governing the payment of wages (emphasis added)). And the use of both the terms "enact" and "adopt" must be read to contemplate different things, or one term will be rendered superfluous. *See Cont'l Bank*, 131 Ariz. at 8.

¶20        Our reading of the subsection is also bolstered by the meaning of the term "law" in this context. Our supreme court has stated that:

> The word "law" in its broadest sense is the body of principles, standards and rules which the courts of a particular state apply in the decision of controversies brought before them. Or it is sometimes said to be nothing more than rules promulgated by government as a means to an ordered

9

society. Under these broad definitions the word "law" includes constitutions, statutes, the common law and the various rules which the courts from time to time necessarily must and do adopt to secure an orderly, definite and consistent administration of justice. On the other hand, the word is frequently used in a restricted sense as meaning an act of the legislature only. There can be no absolute test laid down as to when the one meaning and when the other is to be attributed to the word. It must all depend upon the context with which it is used and the presumed intent of those who use the word, judged by the usual principles of construction.

*State ex rel. Conway v. Superior Court*, 60 Ariz. 69, 75–76 (1942) (citations and quotations omitted), *overruled in part on other grounds*, *Adams v. Bolin*, 74 Ariz. 269, 275 (1952).

**¶21** Here, it appears the legislature intended to attach a broad meaning to the term "law." Section 12-3252(B)(2) focuses on the acts of a *foreign country*, which includes not just its legislative body, but the foreign country's entire government. Broadly interpreting the term also makes sense in the context of the Act, which applies to *all* foreign-country money judgments seeking recognition in Arizona. It thus requires recognizing courts to consider legal systems that might "enact" or "adopt" law in ways that differ significantly from our methods. And if the legislature had intended to limit the "law" to be considered under the act only to legislative acts, it could have said so. We will not read a limitation into a statute when the language and context imply no such restriction. *See Johnson v. Ariz. Dept. of Econ. Sec.*, 247 Ariz. 351, 356, ¶ 16 (App. 2019); *Cicoria v. Cole*, 222 Ariz. 428, 431, ¶ 15 (App. 2009) ("Courts will not read into a statute something that is not within the manifest intent of the legislature as indicated by the statute itself . . . ."). Reference to the decisions of a foreign country's courts may, therefore, be used to avoid A.R.S. § 12-3252(B)(2)'s prohibition, so long as the decisions of the courts demonstrate that the foreign country has adopted a system by which an Arizona judgment is treated similarly to the Act.

### 2. The Netherlands' Process for Recognizing Arizona Judgments is Similar to the Act.

**¶22** We turn to the question of whether the Netherlands has established a system by which the recognition of an Arizona judgment will

be treated similarly to the Act. We conclude that the Netherlands has such a law.[4]

¶23       The system that governs the recognition of foreign-country judgments in the Netherlands begins with Article 431 of the Dutch Code of Civil Procedure, which provides that:

> 1.      Except for what is stated in the sections 985–994 of the Code of Civil Procedure, no decision rendered by foreign courts, nor any authentic deed issued abroad can be enforced within The Netherlands. The matters can be dealt with and settled de novo by the Dutch courts.

> 2.      Disputes may be litigated again in the Dutch courts.

2 C.G. van der Plas et al., *The Netherlands, in* International Execution Against Judgment Debtors ("IEAJD") § 52:4, Westlaw (database updated Dec. 2019). The other sections referenced in Article 431 pertain to the procedure for recognition and enforcement of judgments under a convention such as a bilateral treaty. IEAJD § 52:3. The United States has no such treaty or agreement with the Netherlands. *Enforcement of Judgments*, Travel.State.Gov, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judges.html (last visited Mar. 11, 2020) ("There is no bilateral treaty or multilateral convention in force between the United States and any other country on reciprocal recognition and enforcement of judgments."). Thus, although the plain language of the first sentence of Article 431(1) seems to foreclose recognition and enforcement of foreign-country judgments, the remaining

---

[4]      MD Helicopters contends that we should not consider any materials related to foreign law included in the Netherlands' answering brief because they were not presented in the superior court and because the Netherlands' failed to provide reasonable written notice, filed with the court. Ariz. R. Civ. P. 44.1. But as we stated above, we review an issue concerning a foreign country's law *de novo* and may conduct our "own independent research and analysis" to determine the answer to the relevant question. *Hosogai*, 125 Ariz. at 136–37. Rule 44.1 does not bar consideration of relevant materials. As for the notice required under the rule, neither party was denied adequate notice or an opportunity to address the issues raised.

provisions of Article 431 delegate the authority to decide matters involving such judgments to the Dutch judiciary.

**¶24**        Under this legislative delegation, Dutch courts have for nearly a century interpreted Article 431 only to restrict automatic *enforcement* of a foreign-country money judgment, not its *recognition*.[5] Supreme Court, 26 September 2014, ECLI:NL:HR:2014:2838 (*Gazprombank*), § 3.6.3 (citing Supreme Court, 14 November 1924, NJ 1925, p. 91).[6] Thus, a judgment creditor who has obtained a judgment from a foreign country that lacks a convention with the Netherlands may seek to have the judgment recognized by filing a claim in a Dutch court for simplified proceedings under Article 431(2). *Gazprombank*, § 3.4.2; *see also* IEAJD § 52:13 ("Pursuant to section 431(2) of the Code of Civil Procedure, simplified proceedings must be initiated before a Dutch court in order to obtain the power to enforce in The Netherlands."). Under principles developed in Dutch caselaw, the judgment will not be reviewed on the merits and will be recognized if it meets four requirements:

> 1.        The judgment was rendered by a court that has considered itself competent based on an internationally acceptable ground for jurisdiction;

---

[5]        Recognition of a judgment and enforcement of a judgment are closely related concepts but are not synonymous. "Recognition of a judgment means that the forum court accepts the determination of legal rights and obligations made by the rendering court in the foreign country." Enforcement of a foreign-country judgment, on the other hand, "involves the application of the legal procedures of the state to ensure the judgment debtor obeys the foreign-country judgment." Model Act § 4 cmt. 2 (citing Restatement (Second) of Conflict of Laws, ch. 5, topic 3, intro. note (1971)).

[6]        Indeed, the Netherlands' willingness to recognize foreign judgments under principles of comity appears to stretch back even further. In *Hilton v. Guyot*, 159 U.S. 113, 212 (1895), the United States Supreme Court, quoting from Justice Joseph Story's Commentaries on the Conflict of Laws § 618 (1834), stated the following: "[The Netherlands] seems at all times, upon the general principle of reciprocity, to have given great weight to foreign judgments; and in many cases, if not in all cases, to have given to them a weight equal to that given to domestic judgments, wherever the like rule of reciprocity with regard to Dutch judgments has been adopted by the foreign country whose judgment is brought under review."

2.  The rules of proper administration of justice have been observed;

3.  The recognition of the judgment would not conflict with Dutch public policy; and

4.  The foreign decision should not be irreconcilable with an earlier decision of the Dutch courts between the same parties and involving the same cause of action, or with an earlier decision of a foreign court between the same parties and involving the same cause of action, provided that this earlier court decision of a foreign court fulfils the conditions necessary for its recognition in The Netherlands.

IEAJD § 52:4; *see also Gazprombank*, § 3.6.4. If the foreign-country judgment meets these requirements, it is recognized as conclusive concerning the merits, and the court will issue a Dutch judgment for the amount awarded under the foreign-country judgment that can be executed upon in the same manner and to the same extent as any other Dutch judgment. *Gazprombank*, § 3.6.3 to 3.6.5. From the cases presented by both the Netherlands and MD Helicopters, this test is routinely applied to judgments issued by American courts. *See, e.g.*, District Court of Amsterdam, 22 January 2019, ECLI:NL:RBAMS:2018:9144 (applying the test to a Tennessee judgment); District Court of Rotterdam, 24 March 2010, ECLI:NL:RBROT:2010:BL8614 (*Royal Chemical Corp./Protective B.V., et al.*) (Louisiana judgment); District Court of Rotterdam, 5 November 2003, ECLI:NL:RBROT:2003:AO6792 (*Beervast B.V./Cal Dive Int'l Inc.*) (Texas judgment).

**¶25**  The parallels between the Dutch courts' recognition procedure and the procedures implemented by the Act are similar. Mirroring the Dutch process, the Act requires that recognition of a foreign-country money judgment be sought either by "filing an action" or by raising the issue in a "counterclaim, cross-claim or affirmative defense." A.R.S. § 12-3254(A). Again mirroring the Dutch process, the Act provides that a foreign-country money judgment cannot be recognized if: (1) the foreign-country money judgment "was rendered under a judicial system" that is not "compatible with the requirements of due process of law," A.R.S. § 12-3253(B)(1); and (2) "[t]he foreign court did not have personal jurisdiction over the defendant," A.R.S. § 12-3253(B)(2). Like the Dutch process, the Act also provides that a court may choose not to recognize a foreign-country money judgment if it: (1) "is repugnant to the public policy of this state or of the United States," A.R.S. § 12-3253(C)(3); or (2) "conflicts with another final and conclusive judgment," A.R.S. § 12-3253(C)(4). And

finally, the result of the procedures outlined by the Act is the same as that contemplated by the Dutch process; the foreign-country money judgment is deemed conclusive on the merits, and it is enforceable "in the same manner and to the same extent as a judgment rendered in [Arizona]." A.R.S. § 12-3254(B)(1)–(2).

¶26        Given these similarities, the Netherlands has "enacted or adopted a reciprocal law related to foreign-country money judgments that is similar to [the Act]." A.R.S. § 12-3252(B)(2). In other words, a judgment creditor seeking recognition of an Arizona judgment in the Dutch courts would go through a similar process, have its judgment tested in similar ways, and see recognition result in similar effects to a judgment creditor seeking recognition of a Dutch judgment under the Act.

¶27        MD Helicopters maintains that because the Netherlands is a civil law jurisdiction, caselaw is "merely an interpretation of statutory law," IEAJD § 52:1, and does not, in contrast with common-law jurisdictions, carry the binding authority of precedent. *See* Catherine Valcke, *Quebec Civil Law and Canadian Federalism*, 21 Yale J. Int'l L. 67, 84 (1996). It is true that someday a Dutch court could refuse to apply the accepted, near-century-old process for recognizing foreign-country judgments under Article 431(2) of the Dutch Code of Civil Procedure. But A.R.S. § 12-3252(B)(2) does not require an analysis of what the law in a foreign country might be someday. Instead, it requires a court to consider the state of the law within the foreign country at the time of filing the petition to recognize. If the current law of the foreign country contains a reciprocal means of recognizing a foreign-country money judgment that is "similar to" the Act, it is otherwise sufficient. A.R.S. § 12-3252(B)(2).

¶28        MD Helicopters asserts that differences between Dutch and American courts' conceptions of personal jurisdiction, due process, and public policy compel the conclusion that A.R.S. § 12-3252(B)(2) should apply to bar recognition of the Hague Judgment. But the test under the Act is not whether the Act and the foreign-country's reciprocal law are identical, but whether that law is "similar to" A.R.S. § 12-3252(B)(2). Through Dutch caselaw interpreting the Dutch Code of Civil Procedure and consistent practice, the Netherlands has adopted "a reciprocal law related to foreign-country money judgments that is similar to [the Act]."

**B. The Hague Judgment is not a "Penalty" Under A.R.S. § 12-3252(B)(1)(b).**

¶29      MD helicopters next asserts that the Hague Judgment cannot be recognized under the Act because it constitutes a "penalty" under A.R.S. § 12-3252(B)(1)(b). MD Helicopters grounds this argument in the fact that the majority of the Hague Judgment was awarded under the supply contract's penalty clause, which provided the National Police a "callable penalty of 0.1% of the total price at issue . . . for each day that [a] non-compliance breach persists, up to a maximum of 10%." MD Helicopters argues that two aspects of the penalty clause demonstrate that the Hague Judgment is a penalty: (1) the purpose of the penalty clause was allegedly to deter contractual breaches, not compensate the victim of the breach; and (2) the award made under the penalty clause within the Hague Judgment allegedly bears no relation to the alleged harm that the National Police suffered due to the alleged breach.

¶30      A.R.S. § 12-3252(B)(1)(b) states that the Act does not apply to foreign-country money judgments that are for "[a] fine or other penalty." Because this provision was adopted verbatim from the Model Act, we assume the legislature "intended to adopt the construction placed on the [provision] by its drafters," *UNUM Life Ins. Co. v. Craig*, 200 Ariz. 327, 332, ¶ 25 (2001) (quoting *State v. Sanchez*, 174 Ariz. 44, 47 (App. 1993)), and commentary related to it "is highly persuasive," *id.* The relevant comment within the Model Act explains that "[t]he exclusion of . . . judgments constituting fines or penalties from the scope of the [Model] Act" reflects the tradition that such judgments "have not been recognized and enforced in U.S. courts." Model Act § 3 cmt. 4. To determine whether the Hague Judgment is a penalty under A.R.S. § 12-3252(B)(1)(b), we must decide if our legislature intended to codify the common-law tradition in this provision of the Act—as nearly all courts assessing identical provisions have done. *See, e.g.*, *de Fontbrune v. Wofsy*, 838 F.3d 992, 1000–02 (9th Cir. 2016); *Chase Manhattan Bank, N.A. v. Hoffman*, 665 F. Supp. 73, 75 (D. Mass. 1987); *Desjardins Ducharme v. Hunnewell*, 585 N.E.2d 321, 323–24 (Mass. 1992); *Java Oil Ltd. v. Sullivan*, 86 Cal. Rptr. 3d 177, 183–84 (Cal. App. 2008).

¶31      At common law, American courts' refusal to recognize foreign-country judgments constituting fines or penalties stemmed from the "fundamental maxim of international law" that "[t]he [c]ourts of no country execute the penal laws of another." *Huntington v. Attrill*, 146 U.S. 657, 666 (1892) (quoting *The Antelope*, 10 U.S. (1 Wheat.) 66, 123 (1825)). In *Huntington v. Attrill*, the seminal case on the subject, the Supreme Court discussed the "different shades of meaning allowed to the word 'penal'"

under American and English law. *Id.* The Court concluded that, in the context of enforcing foreign judgments, the term "penalty" was subject to only one definition. *Id.* It held:

> The question whether a statute of one State, which in some aspects may be called penal, is a penal law, in the international sense, so that it cannot be enforced in the courts of another State, depends upon the question whether its purpose is to punish an offense against the public justice of the State, or to afford a private remedy to a person injured by the wrongful act.

*Id.* at 673–74. In other words, a judgment constitutes a penalty in the international sense when the "wrong sought to be redressed is a wrong to the public," *id.* at 668, meaning a wrong constituting a "breach and violation of public rights and duties, which affect the whole community, considered as a community," *id.* (quoting 3 William Blackstone, Commentaries *2). The labels applied to the judgment or the action upon which it is obtained are immaterial; the recognizing court must determine whether the judgment is "in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person." *Id.* at 683.

¶32      *Huntington*'s conception of a penal judgment is also incorporated in the Restatement (Third) of the Foreign Relations Law of the United States ("Restatement") (1987), which this court has previously found persuasive in addressing questions surrounding the recognition of foreign judgments and is explicitly cited in the relevant commentary of the Model Act. Model Act § 3 cmt. 4; *Alberta Sec. Comm'n v. Ryckman*, 200 Ariz. 540, 545, ¶ 15 (App. 2001) (applying Restatement to decide whether to recognize Canadian judgment). Restatement § 483 provides:

> A penal judgment, for purposes of this section, is a judgment in favor of a foreign state or one of its subdivisions, and primarily punitive rather than compensatory in character. A judgment for a fine or penalty is within this section; a judgment in favor of a foreign state arising out of a contract, a tort, a loan guaranty, or similar civil controversy is not penal for purposes of this section.

> \*    \*    \*

> Some states consider judgments penal for purposes of nonrecognition if multiple, punitive, or exemplary damages are awarded, even when no governmental agency is a party.

In the United States, such judgments are not considered penal
for this purpose.

Restatement § 483 cmt. b (citation omitted); *see also id.* Reporters' Note 4
(citing *Huntington*, 146 U.S. at 673–74).

**¶33**        Applying these principles here, the Hague Judgment—and
more specifically, the portion of the judgment related to the award under
the penalty clause—is not a "penalty" within the meaning of the Act. The
proceedings that formed the basis for the Hague Judgment were civil
breach-of-contract actions wherein the National Police sought to vindicate
its private interests as a party to contracts for the sale, delivery, and loaning
of goods. Nothing about these proceedings or the Hague Judgment itself
indicate that the actions or the judgment was intended to "punish an
offense against the public justice" of the Netherlands or to redress a wrong
on behalf of the community of that State. *See Huntington*, 146 U.S. at 673–74,
678.

**¶34**        This conclusion is not altered by the fact that the Hague
Judgment was awarded according to a contract provision labeled as a
"penalty" or that it is in favor of an arm of the Netherlands' government. In
*Huntington*, the Supreme Court specifically cautioned against relying on the
labels associated with a judgment to determine its "essential character and
effect." 146 U.S. at 682–83. Instead, a court must look beyond the vocabulary
used to the purpose of the judgment and the law underlying it. *Id.*; *see also
Wofsy*, 838 F.3d at 1002 (terminology used is "of limited utility in looking
beneath the surface to determine the 'essential character and effect' of the
foreign judgment"). The fact that the Hague Judgment is in favor of a
governmental entity changes nothing. The National Police sued here as a
private party to a contract, not as a public entity seeking redress for a wrong
to the people of the Netherlands. *See* Restatement § 483 cmt. b ("A judgment
in favor of a foreign state arising out of a contract . . . is not penal for
purposes of this section."); *cf.* 64 Am. Jur. 2d *Public Works and Contracts* § 89
("The contracts of public authorities are subject to the same obligations as
those of a private individual.").

**¶35**        MD Helicopters asserts that the nature of contractual penalty
clauses under Dutch law nonetheless reveals that the Hague Judgment's
essential character is that of a penalty. MD Helicopters points to Article 6:91
of the Dutch Civil Code, which defines a contractual penalty clause as a
provision providing for payment of a sum of money upon breach regardless
of whether that sum is compensation for damages or an incentive to
perform the obligation. Because a contractual penalty clause may be used

17

to coerce a party into performing its obligations, and need not be tethered to the actual harm suffered by the non-breaching party, MD Helicopters concludes an award made according to such a clause is not remedial, but penal. But this argument misconstrues the test for whether a judgment is penal in the international sense. Whether a money judgment is a penalty in this context is not resolved simply by determining whether the judgment awards a sum in proportion to the actual harm suffered by a party. *Huntington*, 146 U.S. at 667–68. The critical inquiry is whether, by granting an award above or independent to the harm giving rise to the action, the purpose of the judgment, and the law underlying it, is to redress a *public* or a *private* wrong. *Id.* at 668–69.

¶36        The Ninth Circuit's opinion in *de Fontbrune v. Wofsy* is illustrative on this point. In *Wofsy*, the Ninth Circuit considered whether a judgment awarded under a French court order setting a fixed sum per violation of an injunction on the use of copyrighted photographs constituted a penalty under an identical provision within California's version of the Act. 838 F.3d at 995, 1002–04. Although the judgment "was awarded without determining the actual amount of pecuniary harm suffered" by the violations of the court order, the Ninth Circuit concluded it was not a penalty within the meaning of California's version of the Act because "the purpose of the award was not to punish a harm against the public, but to vindicate [the injured party's] personal interest in having his copyright respected and to deter further future infringements." *Id.* at 1005. The dispositive factor in reaching this conclusion was that, by crafting a "forward-looking remedy imposed to coerce compliance with" the injunction, the French court's order merely created a "personal legal measure of constraint" for the injured party's benefit. *Id.* at 1004–05 (emphasis omitted) (citing *In re Nolan W.*, 203 P.3d 454, 466 (Cal. 2009)).

¶37        Here, if the purpose of the penalty clause was to deter Helifly from breaching the supply contract by setting a sum for each day of noncompliance with its provisions, that fact alone does not render the Hague Judgment a penalty. Under Article 6:91 of the Dutch Civil Code, a contractual penalty clause, like the French court order at issue in *Wofsy*, provides individuals a "forward-looking remedy imposed to coerce compliance" with the obligations created by a contract. And as in *Wofsy*, by awarding the sum contemplated by the penalty clause, the Hague Judgment vindicated the National Police's private interest in ensuring compliance with the terms of the supply contract. The Hague Judgment, therefore, is remedial. It provides a "private remedy to a person injured" by the violation of a contractual provision, not a punishment for "an offense

against the public justice" of the Netherlands. *Huntington*, 146 U.S. at 673–74.

¶38   Finally, in a related argument, MD Helicopters contends that the Hague Judgment is a "penalty" under the *Huntington* test because its award of the sum contemplated by the penalty clause was entirely divorced from the actual injury suffered by the National Police. While the preceding paragraph disposes of MD Helicopters' argument, we note that the circumstances surrounding this case do not indicate the Hague Judgment is wholly divorced from the actual damages suffered by the National Police.

¶39   Under the provisions of the penalty clause, the National Police reserved its right to pursue actual damages "in so far as the loss exceeds the amount of the penalty." In the proceedings before the District Court of The Hague, the National Police asserted its right under the penalty clause to seek actual damages *to the extent they exceeded the amount of the penalty clause* and included a preliminary estimate of actual damages already sustained over €10,000,000. In its judgment, the court found this claim plausible. It authorized the National Police to initiate follow-up proceedings to determine the actual damages suffered, again with the caveat that such an award would only cover the amount above the award related to the penalty clause. The National Police thereafter filed a complaint alleging actual damages of €24,514,469, but specifically noted that the "total amount of loss still has to be reduced by the penalty of €5,868,653" awarded in the Hague Judgment. Although these proceedings are still ongoing, these facts indicate that under both the provisions of the supply contract and Dutch Law, the award made under the penalty clause, in this case, will be subsumed within the actual damages award if those damages are found to exceed the penalty clause award. This evidences that the sum awarded under the penalty clause is not entirely divorced from the actual injury suffered by the National Police.

¶40   Accordingly, because it is not punishment for an offense against the public, but a private remedy afforded to the National Police for action arising out of contract, the essential character of the Hague Judgment is not penal, and it is not a penalty within the meaning of the Act.

## C. MD Helicopters' Other Arguments Either Need Not Be Addressed or Are Waived.

¶41   We briefly address three other arguments raised by MD Helicopters in its briefing. MD Helicopters contends that in adopting the Act, the legislature intended the Act to be the exclusive means by which a

foreign-country money judgment could gain recognition in Arizona, thereby abrogating the court's ability to recognize a foreign-country money judgment under common-law principles of international comity. In the alternative, MD Helicopters also argues that the Hague Judgment should not be recognized under common-law principles of international comity. Because we have concluded the Hague Judgment was recognized correctly under the Act, we need not address these arguments and decline to do so.

¶42            Finally, in a footnote, MD Helicopters claims that this court can refuse to recognize the Hague Judgment if it is "repugnant to the public policy of this state." *See* A.R.S. § 12-3253(C)(3). We are unsure whether this footnote was intended merely to inform this court of a course of action available to it or to argue that the court should apply A.R.S. § 12-3253(C)(3) to refuse to recognize the Hague Judgment. To the extent the footnote raises such an argument, we find it has been waived by MD Helicopters' failure to develop and support it. *Boswell v. Fintelmann*, 242 Ariz. 52, 54, ¶ 7, n.3 (App. 2017) (failure to develop and support conclusory arguments waives them).

## ATTORNEY'S FEES AND COSTS

¶43            Both parties request attorney's fees under A.R.S. § 12-341.01. In our discretion, we award The Netherlands its reasonable attorney's fees under A.R.S. § 12-341.01 and costs under A.R.S. § 12-341 upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

¶44            We affirm the superior court's judgment.



AMY M. WOOD • Clerk of the Court
FILED:  AA

20