******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

ELGO, J., dissenting. The issue presented in this appeal is whether the Superior Court lacked subject matter jurisdiction over a motion to modify a spousal support decree that was issued in the United Kingdom. In resolving that issue, I believe that the trial court properly considered the explanatory note to the statutory instrument in question, the Reciprocal Enforcement of Maintenance Orders (United States of America) Order 2007 of the United Kingdom (order). Reciprocal Enforcement of Maintenance Orders (United States of America) Order, 2007, S.I. 2007/2005, (U.K.). The explanatory note provides necessary context to the enactment of that order and convinces me that the trial court properly determined that it lacked subject matter jurisdiction over the spousal support decree due to the continuing, exclusive jurisdiction of the United Kingdom. Accordingly, I respectfully dissent.

The underlying facts are largely undisputed and are aptly set forth in the majority opinion. The jurisdictional challenge presented in this appeal involves a question of statutory construction, over which our review is plenary. See *Nelson* v. *Dettmer*, 305 Conn. 654, 662, 46 A.3d 916 (2012).

I

In Connecticut, our courts are guided by the familiar maxim that "[w]hen construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [a reviewing court must] first . . . consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citation omitted; internal quotation marks omitted.) *State* v. *Kalil*, 314 Conn. 529, 557–58, 107 A.3d 343 (2014). Statutory language is ambiguous when, read in context, it is susceptible to more than one reasonable interpretation. See *Foisie* v. *Foisie*, 335 Conn. 525, 531–32, 239 A.3d 1198 (2020). In such instances, our courts "may consult extratextual sources" to resolve the issue. *State* v. *Fernando A.*, 294 Conn. 1, 17, 981 A.2d 427 (2009).

As this court has observed, the Uniform Interstate Family Support Act (UIFSA), General Statutes § 46b-301 et seq., "has been adopted by all states, including Connecticut . . . [and] governs the procedures for establishing, enforcing and modifying child and spousal

support, or alimony, orders, as well as for determining parentage when more than one state is involved in such proceedings." (Footnote omitted.) *Hornblower* v. *Hornblower*, 151 Conn. App. 332, 333, 94 A.3d 1218 (2014). Relevant to this appeal is General Statutes § 46b-321 (b), which provides: "A tribunal of this state may not modify a spousal support order issued by a tribunal of another state or a foreign country having continuing, exclusive jurisdiction over that order under the law of that state or foreign country."[1] The plaintiff, Cheryl Abbott Olson, submits, and the trial court agreed, that the order establishes the continuing, exclusive jurisdiction over spousal support decrees that are issued in the United Kingdom.

The critical issue, then, concerns the proper construction of the order. The order is a "statutory instrument" that was issued pursuant to the powers conferred by §§ 40 and 45 (1) of the Maintenance Orders (Reciprocal Enforcement) Act, 1972 (act),[2] a legislative enactment of Parliament that specifically pertains to the reciprocal enforcement of maintenance orders in the United Kingdom or a reciprocating country. In the United Kingdom, statutory instruments are used to "fill in the details of Acts" and, when so authorized by Parliament, "to amend existing laws." See UK Parliament, "What Is Secondary Legislation?," available at https://www.parliament.uk/about/how/laws/secondary-legislation/ (last visited July 20, 2022). They "are published with an explanatory memorandum, which outlines the purpose of the [statutory instrument] and why the change is necessary." Id.

The order was issued on July 25, 2007, at which time UIFSA had been adopted in every state in the United States. See, e.g., *O'Donnell* v. *Abbott*, 393 F. Supp. 2d 508, 514 n.14 (W.D. Tex. 2005) (noting that "[e]very state has adopted either the 1996 or 2001 version of [UIFSA]"), aff'd, 481 F.3d 280 (5th Cir. 2007); *Bouquety* v. *Bouquety*, 933 So. 2d 610, 611 n.1 (Fla. App. 2006) (noting that "Congress required all states to enact UIFSA by January 1, 1998," and that "[b]y the year 2000, UIFSA was in effect in all states"). The order begins by stating that "Her Majesty is . . . satisfied that arrangements have been made in the United States of America to ensure that maintenance orders made by courts in the United Kingdom can be enforced in the United States of America. Her Majesty is also satisfied that in the interests of reciprocity it is desirable to ensure that maintenance orders made by courts in the United States of America can be enforced in the United Kingdom. . . ." Schedule 2, § 1 (1), of the order similarly provides in relevant part that "Her Majesty, if satisfied that, in the event of the benefits conferred by the Part of the Act being applied to . . . maintenance orders made by the courts of any country or territory outside the United Kingdom, similar benefits will in that country or territory will be applied to . . . maintenance orders made by the courts of the United King-

dom . . . ."

The order then outlines procedures for two distinct scenarios. The first involves the "[t]ransmission of [a] maintenance order made in the United Kingdom for enforcement in the United States of America." Schedule 2, § 2 (1), of the order provides in relevant part: "[W]here the payer under a maintenance order made . . . by a court in the United Kingdom is residing or has assets in the United States of America, the payee under the order may apply for the order to be sent to the United States of America *for enforcement*." (Emphasis added.) The order then addresses the "[v]ariation and revocation of [a] maintenance order made in the United Kingdom" and Schedule 2, § 5 (1), of the order specifically indicates that "[t]his section applies to a maintenance order certified copies of which have been sent in pursuance of [§] 2 to the United States of America for enforcement." Section 5 (2) of the order further provides that "[t]he jurisdiction *of a court in the United Kingdom* to revoke, revive or vary a maintenance order shall be exercisable notwithstanding that the proceedings for the revocation, revival or variation, as the case may be, of the order are brought by or against a person residing in the United States of America." (Emphasis added.) Schedule 2, § 5, of the order then addresses various situations in which a modification order is varied or revoked by a court in the United Kingdom. By its plain language, the order contemplates only the *enforcement* of a maintenance order made in the United Kingdom by a court in the United States. It does not contemplate the revocation or variance of such an order by a United States court.

The second scenario addressed by the order involves the "[r]egistration in [a] United Kingdom court of [a] maintenance order made in the United States of America." Schedule 2, § 6, of the order provides that "a maintenance order made . . . by a court in the United States of America" shall be registered in a United Kingdom court upon receipt of a certified copy thereof. Schedule 2, § 8, of the order then addresses the enforcement of such a maintenance order registered in the United Kingdom and § 9 addresses the "[v]ariation and revocation of [a] maintenance order registered in [a] United Kingdom [c]ourt," stating in relevant part: "(1) Where a registered order *has been varied by a court in the United States of America*, the registered order shall . . . have effect as varied by that order. . . . (2) Where a registered order *has been revoked by a court in the United States of America*, the registered order shall . . . be deemed to have ceased to have effect." (Emphasis added.) The order thus expressly contemplates a United States court revoking or varying a maintenance order that originally was made by a United States court.

Because the order by its plain terms is amendatory in nature, in that it expressly sets forth numerous "modi-

fications" to the act with respect to the United States and orders the amendment or substitution of various sections, I believe it is necessary to also consider the relevant provisions of the act, as originally enacted in 1972. See 1A N. Singer & J. Singer, Sutherland Statutory Construction (7th Ed. 2009) § 22:29, p. 349 ("[t]o ascertain the meaning of amendatory language, courts must look to prior law"); id., § 22:32, p. 377 ("[t]he original act must be compared with the amendment to determine what defect or defects in the original act the legislature intended to remedy"); see also *State* v. *AFSCME, Council 4, Local 1565*, 249 Conn. 474, 478–80, 732 A.2d 762 (1999) (comparing text of statute and recent amendment to that statute to construe its meaning); *Turner* v. *Turner*, 219 Conn. 703, 717, 595 A.2d 297 (1991) ("[a]ccording to well established principles of statutory construction, an amendment that construes and clarifies a prior statute operates as the legislature's declaration of the meaning of the original act"). Significantly, § 9 of the act, as enacted in 1972, authorized a United Kingdom court to vary or revoke a maintenance order that originally was made in a reciprocating country and registered in a United Kingdom court.[3] The order, however, eliminates the authority of a United Kingdom court to vary or revoke a maintenance order made by a United States court.[4]

Section 5 of the act, as originally enacted in 1972, likewise permitted "a competent court in a reciprocating country" to vary or revoke a maintenance order made by a United Kingdom court.[5] By contrast, § 5 of the order, which is titled "Variation and revocation of maintenance order made in United Kingdom," omits all such references to "a competent court in a reciprocating country" and recognizes only the authority of "a court in the United Kingdom" to vary or revoke a maintenance order made by a United Kingdom court.

It is axiomatic that statutory provisions are not to be read in isolation, but must be read in light of their "relationship to the broader statutory scheme." *Foisie* v. *Foisie*, supra, 335 Conn. 531; see also *Norris* v. *Trumbull*, 187 Conn. App. 201, 219, 201 A.3d 1137 (2019) ("[w]e do not read statutory language in isolation, but rather must consider it within the context of the statute as a whole and in harmony with surrounding text"). Schedule 2, § 5 (2), of the order specifically provides that "[t]he jurisdiction of a court in the United Kingdom to revoke, revive or vary a maintenance order *shall be exercisable* notwithstanding that the proceedings for the revocation, revival or variation, as the case may be, of the order are brought by or against a person residing in the United States of America." (Emphasis added.) When viewed in relation to the broader statutory scheme set forth in the order and the act—which both provide for the reciprocal enforcement of domestic maintenance orders as a matter of international law— I would conclude that Schedule 2, § 5, of the order is

susceptible to more than one reasonable interpretation as to whether it recognizes the "continuing, exclusive jurisdiction"; see General Statutes § 46b-321 (b); of United Kingdom courts over maintenance orders that were made in the United Kingdom and subject to enforcement in the United States. For that reason, I believe that Schedule 2, § 5, is ambiguous, and thus resort to extratextual materials is warranted. See *Foisie* v. *Foisie*, supra, 531; *State* v. *Fernando A.*, supra, 294 Conn. 17.

Appended to the order is an "Explanatory Note" (note) that states in relevant part: "The principal modification effected by this Order is that a maintenance order made in the United States of America may not be varied or revoked in the United Kingdom and that a maintenance order made in the United Kingdom may not be varied or revoked in the United States of America . . . ." In addition, the United Kingdom's Ministry of Justice prepared an "Explanatory Memorandum" to the order (memorandum) that was "laid before Parliament by Command of Her Majesty."[6] That memorandum similarly explains that the order "remove[s] the power of courts in the United Kingdom to vary or revoke incoming orders which makes the application consistent as *the competent authorities in the United States do not have a power to vary orders from the United Kingdom*." (Emphasis added.) See Explanatory Memorandum to the Reciprocal Enforcement of Maintenance Orders (United States of America) Order 2007 and the Recovery of Maintenance (United States of America) Order 2007, available at https://www.legislation.gov.uk/uksi/2007/2005/pdfs/uksiem_20072005_en.pdf (last visited July 20, 2022). In opposing the motion to dismiss, the defendant, Brian Matthew Olson, provided no extratextual material to rebut the proposition set forth in the note and the memorandum.[7]

To my mind, those explanatory materials resolve any issue as to the intent of the order and persuade me that the trial court properly determined that it lacked subject matter jurisdiction over the spousal support decree in question due to the continuing, exclusive jurisdiction of the United Kingdom.

II

The foregoing analysis is predicated on the assumption that the analytical framework for statutory interpretation under Connecticut law governs the present dispute. I respectfully submit that this assumption may be flawed and that a reviewing court tasked with construing a statutory enactment of a foreign country instead must apply the precepts applicable in that foreign jurisdiction.

As one noted treatise has observed, "[o]ne question that arises [when construing a foreign statute] is whether to follow the forum state's or the state of origin's rules

of construction. Some courts look to their own . . . rules of statutory interpretation to resolve the issue. But probably the better approach invokes the state of origin's interpretive rules . . . . Courts are more likely to achieve uniform application of statute law and avoid some of the uncertainties entailed by foreign suits if they apply the interpretive rules to which a foreign statute ordinarily is subject." (Footnotes omitted.) 2 S. Singer, Statutes and Statutory Construction (8th Ed. 2022) § 38:5, pp. 124–25; see also *Magee* v. *Huppin-Fleck*, 279 Ill. App. 3d 81, 88, 664 N.E.2d 246 (1996) (in case involving interpretation of foreign statute, court applied "principles of statutory construction adhered to" by courts of that foreign jurisdiction); *Alropa Corp.* v. *Smith*, 240 Mo. App. 376, 381, 199 S.W.2d 866 (1947) ("[i]n ascertaining the effect of . . . the foreign statutes, courts of the forum will construe the statutes of the [foreign] state as construed by its courts and follow the rules of law of the [foreign] state" (internal quotation marks omitted)).

In *Carbone* v. *Nxegen Holdings, Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-13-6039761-S (October 3, 2013) (57 Conn. L. Rptr. 36), the Superior Court noted that it "could find no Connecticut authority concerning what rules of construction should apply in interpreting the meaning of another state's statute. As a matter of first impression, the court believes it would be illogical for a Connecticut statute to determine how a [foreign] statute should be interpreted. It is presumed that each set of legislators had their own rules of statutory interpretation in mind when drafting their respective statutes, so [that foreign jurisdiction's] rules of statutory interpretation should be applied to best implement the intended meaning of the [foreign] statute." Id., 42 n.4. I concur with that assessment, particularly in a case such as this, which involves foreign relations and international agreements. See *ESAB Group, Inc.* v. *Zurich Ins. PLC*, 685 F.3d 376, 388 (4th Cir. 2012) ("[w]here a statute touches upon foreign relations and the United States' treaty obligations, we must proceed with particular care in undertaking this interpretive task"); see also *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319, 57 S. Ct. 216, 220, 81 L. Ed. 255 (1936) (foreign relations is "vast external realm" that presents "important, complicated, delicate and manifold problems"); *de Fontbrune* v. *Wofsy*, 838 F.3d 992, 994 (9th Cir. 2016) ("this appeal illustrates the difficulty that can arise in determining foreign law and the confusion surrounding the role of foreign law in domestic proceedings"); *Al-Bihani* v. *Obama*, 619 F.3d 1, 39 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("[c]ourts are . . . rightly hesitant to construe foreign affairs statutes more narrowly than the text indicates").

When construing a statutory enactment, Connecticut's courts are guided by "considerations of the constitutional separation of powers [and] respect for the

authority of a coordinate branch of government . . . ." *Mueller* v. *Tepler*, 312 Conn. 631, 661, 95 A.3d 1011 (2014). Principles of judicial restraint, as well as the legislative mandate of General Statutes § 1-2z, preclude our courts from considering extratextual evidence when no ambiguity exists. See, e.g., *Marciano* v. *Jiminez*, 324 Conn. 70, 75–76, 151 A.3d 1280 (2016) ("we . . . will not consider extratextual evidence of the meaning of a statute unless the text is ambiguous or would yield an absurd or unworkable result"); *State* v. *Cayo*, 143 Conn. App. 194, 202, 66 A.3d 887 (2013) ("[i]f the meaning is clear and workable, we do not consider extratextual evidence").

The legislative process in the United Kingdom is altogether different, as the legislative and executive branches of government frequently work in tandem to craft and amend legislative acts. For that reason, the analytical framework that governs statutory interpretation in Connecticut is inapposite when construing statutory instruments. Indeed, statutory instruments in the United Kingdom are akin to executive orders issued by our governor pursuant to authority conferred by the General Assembly. The statutory instrument at issue here was promulgated not by Parliament, but rather by the executive branch pursuant to the authority granted under §§ 40 and 45 (1) of the act. See footnote 2 of this dissenting opinion.

Whereas acts of Parliament are considered "primary legislation" in the United Kingdom, statutory instruments are considered "secondary" or "delegated" legislation that are enacted pursuant to authority conferred by an enabling act of Parliament. Statutory instruments are drafted by ministerial agencies and, depending on the authorization contained in the enabling act, are scrutinized by Parliament in a manner described as either an affirmative or negative procedure. The order here was "subject to [the] negative resolution procedure"; see Explanatory Memorandum to the Reciprocal Enforcement of Maintenance Orders (United States of America) Order 2007 and the Recovery of Maintenance (United States of America) Order 2007, supra; and was automatically approved when Parliament took no action to annul. See UK Parliament, supra. Significantly, "Parliament can either approve or reject [a statutory instrument], but cannot amend it." Id. For that reason, explanatory notes and explanatory memoranda to statutory instruments play a major role in facilitating parliamentary scrutiny. See J. Caird, Public Legal Information and Law-Making in Parliament, Parliament and the Law (A. Horne & G. Drewry eds., 2d Ed. 2018) p. 158.

Although explanatory notes routinely incorporate the caveat that they are "not part" of legislation, decisional law from the United Kingdom indicates that explanatory notes nonetheless are "admissible" as aids to statutory construction of both primary and secondary legisla-

tion.[8] In the seminal case of *Westminster City Council* v. *National Asylum Support Service*, [2002] UKHL 38 (H.L.), Lord Steyn observed: "In 1999 a new [legislative practice] was introduced. It involves publishing [e]xplanatory [n]otes alongside the majority of public bills introduced . . . . The texts of such notes are prepared by the [g]overnment department responsible for the legislation. The [e]xplanatory [n]otes do not form part of the [b]ill, are not endorsed by Parliament and cannot be amended by Parliament. The notes are intended to be neutral in political tone: they aim to explain the effect of the text and not to justify it. The purpose is to help the reader to get his bearings and to ease the task of assimilating the law. . . . The [e]xplanatory [n]otes accompany the [b]ill on introduction and are updated in the light of changes to the [b]ill made in the parliamentary process. Explanatory [n]otes are usually published by the time the legislation comes into force. Unlike [legislative history] material there are no costly researches involved. . . .

"The question is whether in aid of the interpretation of a statute the court may take into account the [e]xplanatory [n]otes and, if so, to what extent. The starting point is that language in all legal texts conveys meaning according to the circumstances in which it was used. It follows that the context must always be identified and considered before the process of construction or during it. It is therefore wrong to say that the court may only resort to evidence of the contextual scene when an ambiguity has arisen. . . . [I]n his important judgment in *Investors Compensation Scheme Ltd* v. *West Bromwich Building Society* [1998] 1 WLR 896, 912–13, Lord Hoffmann made crystal clear that an ambiguity need not be established before the surrounding circumstances may be taken into account. The same applies to statutory construction. . . .

"Again, there is no need to establish an ambiguity before taking into account the objective circumstances to which the language relates. Applied to the subject under consideration the result is as follows. Insofar as the [e]xplanatory [n]otes cast light on the objective setting or contextual scene of the statute, and the mischief at which it is aimed, such materials are therefore always admissible aids to construction. They may be admitted for what logical value they have. Used for this purpose [e]xplanatory [n]otes will sometimes be more informative and valuable than reports of the Law Commission or advisory committees, [g]overnment green or white papers, and the like. After all, the connection of [e]xplanatory [n]otes with the shape of the proposed legislation is closer than pre-parliamentary aids which in principle are already treated as admissible . . . ." (Citations omitted.) Id., ¶¶ 4–5.

Following that decision, United Kingdom courts often have considered explanatory notes when construing

statutory instruments. See, e.g., *9 Cornwall Crescent London Ltd.* v. *Kensington & Chelsea*, Docket No. B2/2004/1560, 2005 WL 607512 (EWCA (Civ.) March 22, 2005) ("Courts have moved away from a purely literal approach to statutory interpretation. . . . By 'context', I mean the legislative context, and the policy context, as shown by any admissible material, such as . . . explanatory notes . . . ."); *R* v. *Montila*, [2004] UKHL 50 35, available at https://publications.parliament.uk/pa/ld200405/ldjudgmt/jd041125/mont.pdf (last visited July 20, 2022) ("[i]t has become common practice for their Lordships to ask to be shown the [e]xplanatory [n]otes when issues are raised about the meaning of words used in an enactment"); *Confederation of Passenger Transport UK* v. *Humber Bridge Board*, 2002 WL 31422280 (EWCH (Admin.) November 1, 2002) (relying in part on explanatory note to statutory instrument to support conclusion that lower court properly supplied language inadvertently omitted from order); R. Munday, "In the Wake of 'Good Governance': Impact Assessments and the Politicisation of Statutory Interpretation," 71 Mod. L. Rev. 385 (2008) (noting growing willingness of United Kingdom judges to employ explanatory notes as aid to interpretation); D. Greenberg, "All Trains Stop at Crewe: The Rise and Rise of Contextual Drafting," 7 Eur. J. L. Reform 31, 37–38 (2005) (discussing use of explanatory notes as aid to statutory construction and observing that "the courts have appeared to be increasingly relaxed about the use of a wide range of material produced by the executive"). As one commentator on statutory interpretation in the United Kingdom has observed, "[i]t is the present practice that almost every [b]ill introduced [in] . . . Parliament is accompanied by a set of [e]xplanatory [n]otes, prepared by the [g]overnment, and although these [n]otes declare that they are not necessarily authoritative, the courts early on established their willingness to have regard to them . . . for the purpose of determining the context within which the emerging Act is construed . . . ." (Footnote omitted.) 96 Halsbury's Laws of England (5th Ed. 2018) p. 483.

That authority suggests that, unlike the framework for statutory interpretation under Connecticut law, courts in the United Kingdom may consider an explanatory note to a statutory instrument irrespective of whether an ambiguity exists. In the present case, the note and memorandum both provide necessary context to the enactment of the order, and leave little doubt that it was intended to memorialize the continuing, exclusive jurisdiction of the United Kingdom courts over maintenance orders made in their courts. Accordingly, I would conclude that the trial court properly determined that it lacked subject matter jurisdiction over the spousal support decree in the present case.

For the foregoing reasons, I respectfully dissent.

[1] General Statutes § 46b-302 (5) defines " '[f]oreign country' " in relevant

part as "a country . . . other than the United States, that authorizes the issuance of support orders and (A) which has been declared under the law of the United States to be a foreign reciprocating country . . . or (D) in which the [Convention on the International Recovery of Child Support and Other Forms of Family Maintenance, concluded at The Hague on November 23, 2007 (convention); see General Statutes § 46b-302 (3)] is in force with respect to the United States." The United States Secretary of State has declared the United Kingdom to be a "foreign reciprocating country" for the purpose of family support obligations. See 42 U.S.C. § 659a (2018); Notice of Declaration of Foreign Countries as Reciprocating Countries for the Enforcement of Family Support (Maintenance) Obligations, 73 Fed. Reg. 72,555 (November 28, 2008). Moreover, as the North Carolina Court of Appeals has noted, "[r]eciprocity currently exists under UIFSA between all American states and the following foreign jurisdictions: Australia, Austria, Bermuda . . . United Kingdom (England, Wales, Scotland, Northern Ireland)." (Internal quotation marks omitted.) *Foreman* v. *Foreman*, 144 N.C. App. 582, 585, 550 S.E.2d 792, review denied, 354 N.C. 68, 553 S.E.2d 38 (2001). In addition, the convention has been ratified by both the United States and the United Kingdom.

[2] Section 40 of the act provides: "Where Her Majesty is satisfied—

"(a) that arrangements have been or will be made in a country or territory outside the United Kingdom to ensure that maintenance orders made by courts in the United Kingdom against persons in that country or territory can be enforced in that country or territory or that applications by persons in the United Kingdom for the recovery of maintenance from persons in that country or territory can be entertained by courts in that country or territory; and

"(b) that in the interest of reciprocity it is desirable to ensure that maintenance orders made by courts in that country or territory against persons in the United Kingdom can be enforced in the United Kingdom or, as the case may be, that applications by persons in that country or territory for the recovery of maintenance from persons in the United Kingdom can be entertained by courts in the United Kingdom,

"Her Majesty may by Order in Council make provision for applying the provisions of this Act, with such exceptions, adaptations and modifications as may be specified in the Order, to such orders or applications as are referred to in paragraphs (a) and (b) above and to maintenance and other orders made in connection with such applications by courts in the United Kingdom or in that country or territory." Maintenance Orders (Reciprocal Enforcement) Act, 1972, c. 18, § 40 (U.K.), available at https://www.legislation.gov.uk/ukpga/1972/18/section/40/enacted (last visited July 20, 2022).

Section 45 (1) of the act provides: "An Order in Council under section 1, section 25 or section 40 of this Act may be varied or revoked by a subsequent Order in Council thereunder, and an Order made by virtue of this section may contain such incidental, consequential and transitional provisions as Her Majesty considers expedient for the purposes of that section." Maintenance Orders (Reciprocal Enforcement) Act, 1972, c. 18, § 45 (1) (U.K.).

[3] Section 9 (1) of the act previously provided in relevant part that a court of the United Kingdom in which a maintenance order made in a reciprocating country was registered "(a) shall have the . . . power, on an application made by the payer or payee under a registered order, to vary or revoke the order as if it had been made by the registering court and as if that court had had jurisdiction to make it; and (b) shall have power to vary or revoke a registered order by a provisional order." Maintenance Orders (Reciprocal Enforcement) Act, 1972, c. 18, § 9 (1) (U.K.).

[4] In both the act and the order, § 9 is titled "Variation and revocation of maintenance order registered in United Kingdom Court."

[5] See Maintenance Orders (Reciprocal Enforcement) Act, 1972, c. 18, § 5 (7) and (8) (U.K.).

[6] Explanatory memoranda are prepared by government officials to supplement an explanatory note. J. Caird, Public Legal Information and Law-Making in Parliament, Parliament and the Law (A. Horne & G. Drewry eds., 2d Ed. 2018) p. 158.

[7] I also observe that, in *Hornblower* v. *Hornblower*, supra, 151 Conn. App. 333, this court "examine[d] the provisions" of UIFSA. At issue in that appeal was the proper interpretation of General Statutes § 46b-212d (c). Id., 336. Although this court did not find any provision of that statute ambiguous, it did not confine its review to the text of the statute itself and its relationship to other statutes. Rather, the court discussed the "historical and statutory notes" to that statute; id., 337; and then extensively detailed certain com-

ments to the uniform code on which UIFSA was modeled. See id., 337–38. Given this court's reliance on those "statutory notes" and the comments to a model code in interpreting a provision of our General Statutes, I fail to see how the trial court's reliance on the note in the present case was improper.

[8] As the majority correctly notes, the plaintiff in this case provided very little to the trial court and this court about the foreign law in question. At the same time, "because foreign law interpretation and determination is a question of law, independent judicial research does not implicate the judicial notice and ex parte issues spawned by independent factual research undertaken by a court." *de Fontbrune* v. *Wofsy*, supra, 838 F.3d 999. "Independent research . . . together with extracts of foreign legal materials, has been and will likely continue to be the basic mode of determining foreign law." (Internal quotation marks omitted.) Id., 997. "Although our common law system relies heavily on advocacy by the parties, judges are free to undertake independent *legal* research beyond the parties' submissions. It is no revelation that courts look to cases, statutes, regulations, treatises, scholarly articles, legislative history, treaties and other legal materials in figuring out what the law is and resolving legal issues." (Emphasis in original.) Id., 999.

---